224 F.2d 504
 UNITED STATES of America ex rel. David DARCY, Appellant,
v.
Earl D. HANDY, Warden of Bucks County Prison, Dr. Fred S.
Baldi, Warden of the Western State Penitentiary, Rockview,
and Carl H. Fleckenstine, United States Marshal for the
Middle District of Pennsylvania.
 No. 11564.
 United States Court of Appeals Third Circuit.
 Argued April 4, 1955.
Decided June 9, 1955.
Rehearing Denied July 11, 1955.
 
 J. Dress Pannell, Harrisburg, Pa. (Charles J. Margiotti, Morton Witkin, Philadelphia, Pa., on the brief), for appellant.
 Frank P. Lawley, Jr., Deputy Atty. Gen. of Pennsylvania (Donald W. Van Artsdalen, Dist. Atty., Doylestown, Pa., Herbert B. Cohen, Atty. Gen., on the brief), for appellees.
 Before BIGGS, Chief Judge, and MARIS, GOODRICH, McLAUGHLIN, KALODNER, STALEY and HASTIE, Circuit Judges.
 HASTIE, Circuit Judge.
 
 
 1
 In this habeas corpus proceeding the relator, a Pennsylvania state prisoner under sentence of death for murder, is contending that he was tried under such prejudicial circumstances and improper influences that it becomes the duty of a federal court to invalidate the state conviction as a denial of due process of law and to order a new trial.
 
 
 2
 The district court originally dismissed the petition without permitting relator to introduce evidence in support of his contentions. 97 F.Supp. 930. But on appeal this court ruled 'that the relator must be afforded the opportunity to prove the allegations set out in his petition for habeas corpus insofar as they relate to the alleged atmosphere of hysteria and prejudice prevailing at his trial, including any issues raised by Judge Boyer's asserted visits to the courtroom during Darcy's trial, since the undisputed and incontrovertible facts as shown by the record do not countervail the allegations of hysteria and prejudice.' 3 Cir., 203 F.2d 407, 409. Accordingly, the case was remanded to the district court for a full hearing on the indicated issues.
 
 
 3
 In compliance with our mandate the district court permitted the parties to make an elaborate showing of the circumstances under which the relator was tried in Bucks County, Pennsylvania, for felonious homicide in the commission of an armed robbery. Although the relator had been contesting his conviction for more than six years, this was the first opportunity given him to introduce evidence to establish facts not apparent on the face of the original trial record which, in his view, would make clear that the trial was fundamentally unfair. In affording this opportunity, the district court devoted eight days to the testimony of more than thirty witnesses and the introduction of much documentary evidence. As a result, that court and this reviewing court now for the first time have been able to exercise fully informed judgment as to the essential fairness of the murder trial. It was specially important that this be done because there had been no taking of testimony on the relevant circumstances of the trial before any Pennsylvania state court in which the conduct of relator's trial had been challenged as essentially unfair. We emphasize this because we believe it is a virtue of our system of justice, as implemented by the due process clause of the Fourteenth Amendment, that it does not send a convicted person to his death without according him one full opportunity to prove charges of unfair trial which are not patently frivolous. The important thing here is that relator has now had that chance.
 
 
 4
 After full hearing and consideration of all of the evidence the district court was satisfied that relator's new proof was insufficient to establish that his trial had been fundamentally unfair. 130 F.Supp. 270. We agree with that conclusion.
 
 
 5
 Relator has attempted to show that he was tried in a community so aroused against him that a fair trial was impossible, or at best so unlikely that a decent legal system must permit a second trial. Such a conclusion has been reached where the physical presence of a mob or a threat of mob violence has dominated a criminal trial. Frank v. Mangum, 1915, 237 U.S. 309, 35 S.Ct. 582, 59 L.Ed. 969; Moore v. Dempsey, 1923, 261 U.S. 86, 43 S.Ct. 265, 67 L.Ed. 543; Powell v. State of Alabama, 1932, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158. But on the evidence adduced in the district court it is clear, as that court found, that relator's trial was conducted with dignity and decorum and without any hostile congregation or demonstration at or near the place of trial. Indeed, during much of the trial the courtroom was not crowded. Certainly, the trial was not attended by any threat of violence or manifestation of mass hysteria. Moreover, a clear and elaborate showing was made to the district court that throughout relator's trial the jury was kept under strict guard, apart from other persons and without access to newspapers, radio, television or any other source of news or opinion.
 
 
 6
 However, the relator suggests that even though the jury was segregated and the community was outwardly calm during the trial, antagonism and hostility toward him were so great and wide-spread during the period immediately preceding the trial, that the probability of a prejudiced verdict from any jury of the vicinage was a greater risk than a society which insists upon equal justice under law can take. A combination of unchallenged facts has made it very difficult for the relator to establish such extreme and pervasive hostility. The record of the original trial, which is before the court in this collateral proceeding, shows that each of the prospective jurors was subjected to a searching voir dire examination. The questioning of the fourteen persons who became the jurors and alternates for this trial takes up some seventy pages of the typewritten record. Their responses indicated that they were capable of making and disposed to make a fair and objective evaluation of the evidence. Beyond that, original counsel for the relator was sufficiently satisfied with the responses of these veniremen so that he used less than half of the peremptory challenges available to him. And he did not at any time ask for a change of venue. Concerning the significance of this, see Stroble v. State of California, 1952, 343 U.S. 181, 194, 72 S.Ct. 599, 96 L.Ed. 872; United States v. Rosenberg, 2 Cir., 1953, 200 F.2d 666, 669. While to a majority of this court these facts alone have not seemed so compelling as to preclude an independent showing that the trial was dominated by prejudice and hostility, they certainly make the undertaking very difficult. To meet this difficult burden of proof relator has relied largely upon the daily newspaper accounts and editorial comments published in the community during the trial of two of relator's alleged confederates, which ended only three days before he himself was required to stand trial. We have examined all of this material. The evidence does not indicate, as relator would infer, that the jurors who tried relator were waiting in or near the courtroom during the period of the trial of his confederates. At most it indicates that during the two weeks immediately preceding relator's trial the community in general had experienced a revival and quickening of interest in the homicide attended by many expressions of indignation against its perpetrators. But it does not appear that feeling ran so high or that hostility toward the relator was so intense and so general as to make it seem incredible that the search for a satisfactory jury would yield twelve persons as open minded about this case as the jurors here claimed to have been. The situation certainly would have justified a decision to wait a while before trying the relator, or else to try him in another community if trial immediately after the conviction of his confederates was deemed important. We may be persuaded that in the circumstances it would have been wise to take such precautions, yet not be convinced that failure to follow the wiser course was a denial of the essence of fair trial. The due process concept does not embrace all that a very careful and perceptive judge might do to protect a trial against emotional factors. It covers no more than the minimum protection which, consistent with our present ideas of justice, every court must afford. In this view of the reach of due process, we can not say that trial of relator at the time and place in question was a denial of constitutionally required protection.
 
 
 7
 Relator makes a second contention. Judge Hiram Keller presided over relator's trial. But another judge of the same court, Honorable Calvin Boyer, was much in and about the courtroom during the course of this trial. Judge Boyer had just completed a trial at which relator's confederates had been convicted of first degree murder without recommendation of mercy and, according to the press, he had commended the jury for its verdict. It is relator's contention that Judge Boyer's participation in and influence upon the trial were so unfair and prejudicial as to amount to a denial of due process of law. Here too the facts are now for the first time fully disclosed in the record. Relator's trial began June 7 and he was convicted June 14. There were daily morning and afternoon sessions. It now appears that every day of this trial Judge Boyer spent some time, on occasions several hours, in the courtroom. He even attended an evening session. At times during the trial Judge Boyer joined Judge Keller on the bench for whispered consultations within view of the jury, although there is nothing to suggest that the jury could hear what was being said. It is also admitted that at least one such consultation was designed for the guidance of Judge Keller in the making of a trial ruling. However, there is no claim that any erroneous or prejudicial ruling resulted from consultation between the presiding judge and his colleague. Finally, during Judge Keller's charge to the jury, Judge Boyer sat facing the jurors within the enclosure reserved for members of the bar and participants in the trial.
 
 
 8
 It seems to be agreed that the jurors knew who Judge Boyer was. The evidence makes it very probable that they also knew that he had just completed the trial at which relator's co-defendants had been convicted and sentenced to death. Moreover, it had been reported in the press that Judge Boyer had commended the jury for the first degree verdict against the co-defendants with its mandatory death penalty. Relator also makes the point that, while his trial was in progress, the press quoted statements of Judge Boyer in another case reasonably calculated to indicate that the jurist was engaged in an effort to make it clear that the community would deal very sternly with wrongdoers from Philadelphia, a category which included the relator. But this last incident could not have affected the jury in relator's case, because the jurors had no access to any source of news. Nevertheless, relator argues that the overall effect of this situation was to make Judge Boyer's impressive record of attendance at this trial an intolerably coercive influence upon the trial jury. But we think this is attaching too much significance to the jury's observation that a judge other than the trial judge was showing much interest in the case. Certainly Judge Boyer was privileged to attend and observe proceedings of the court of which he was a judge. His presence in itself was not an impropriety. Even if the jurors identified him as an official who was hostile to the relator, we think it would be necessary to show that he had said or done something prejudicial to the defendant during his stay in the courtroom before the fact of his presence and manifest interest could raise a substantial due process question.
 
 
 9
 The present petition charges one such act and this allegation has given us great concern. The relator alleged and attempted to prove that during the trial Judge Boyer actively helped the prosecutor. Specifically, there was testimony from witnesses who may well not have been unbiased that on one occasion Judge Boyer passed a written message to the prosecutor with the result that the prosecutor made a point to the presiding judge about an item in the charge. The government introduced evidence for the purpose of disproving this contention. The government's showing was less than overwhelming. Yet it was not unsubstantial. There was a sufficient conflict of testimony to make it necessary for the district court as the trier of facts in this habeas corpus proceeding to resolve the factual question whether Judge Boyer did or did not coach and advise the prosecutor as alleged. The district court made a specific finding that this alleged occurrence did not take place. On the record we think that we are not justified in disturbing that finding. And absent some such improper partisan participation by Judge Boyer in the trial, we cannot say that his rather striking manifestation of extraordinary interest in the proceedings constituted a denial of due process of law. It is established constitutional doctrine that our limited function in correcting fundamental impropriety in state trials challenged under the due process clause makes it necessary that we leave alone many dubious occurrences in state procedure which we would proscribe if they should happen in a federal court. With Betts v. Brady, 1942, 316 U.S. 455, 62 S.Ct. 1252, 86 L.Ed. 1595, contrast Johnson v. Zerbst, 1938, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461.
 
 
 10
 No other point urged by relator warrants appellate interference with the decision of the district court or requires particular comment.
 
 
 11
 The judgment will be affirmed.
 
 
 12
 KALODNER, Circuit Judge (dissenting).
 
 
 13
 Under Pennsylvania law the jury fixes the penalty in first degree murder cases-- imprisonment for life, or death.[1]
 
 
 14
 It is against the forefront of that grim and grave circumstance that Judge Boyer's conduct in the Darcy trial must be viewed, weighed and assessed and the issue determined whether Darcy was denied the due process guaranteed him by the Fourteenth Amendment. In doing so it must ever be kept in mind that "due process of law' in the enforcement of a state's criminal law * * * expresses a demand for civilized standards of law' and 'judicial review of that guaranty of the Fourteenth Amendment inescapably imposes * * * an exercise of judgment upon the whole course of the proceedings in order to ascertain whether they offend those canons of decency and fairness which express the notions of justice of English-speaking peoples even toward those charged with the most heinous offenses.'[2] (Emphasis supplied.)
 
 
 15
 In my opinion the majority has failed to discern and assess the impact of Judge Boyer's conduct in the Darcy trial from the point of view, at the minimum, of the jury's role in determining Darcy's fate-- life or death.
 
 
 16
 I am of the opinion, too, that the majority erred in another important respect-- in treating Judge Boyer's conduct as an 'occurrence', albeit 'dubious', 'in state procedure', immune as such, from federal judicial remedial action.
 
 
 17
 Let us first consider the issue of Judge Boyer's role in the Darcy trial.
 
 
 18
 Bucks County, where Darcy was tried, at the time had a population of approximately 144,000-- 75 percent rural, 25 percent urban. Judge Boyer, then 72 years of age, was a native of Bucks County and had spent his entire life in the community. He had been a judge of the Bucks County Courts for some eighteen years. The extent to which he was known in the county is demonstrated by the fact that he had been its district attorney, twice by appointment and once by election; he had twice been elected for 10-year terms as judge (once in 1931 and again in 1941).
 
 
 19
 Judge Boyer had presided at the trial of Darcy's two confederates which terminated Friday, June 4th with a verdict of guilty and the imposition of death sentences by the jury. Judge Boyer had complimented the jury on its action, stating: 'I don't see how you could, under the evidence, have reached any other verdict. Your verdict may have a very wholesome effect on other young men in all vicinities who may come to realize the seriousness of the folly in which so many young men indulge in these days. The only hope of stemming the tide of such crime by youth is to impose the law which you have indicated by your decision.' (Emphasis supplied.)[3]
 
 
 20
 Three days later, Darcy was placed on trial in the same court house in spite of the fact that he had previously been granted a 'severance'.[4] While I agree with the majority that this circumstance, standing alone, did not constitute denial of due process, it merits most serious consideration in evaluating the impact of Judge Boyer's conduct in the Darcy trial since the trial of the confederates had been widely reported not only in the local newspapers and via radio but in nearby Philadelphia newspapers which had a considerable circulation in Bucks County.[5]
 
 
 21
 President Judge Hiram H. Keller of the Bucks County Court presided at Darcy's trial. He had, at the time, served some eighteen years as president judge.
 
 
 22
 It may be well at this point to advert to the factual findings which the majority made on the score of Judge Boyer's presence in the courtroom during Darcy's trial:
 
 
 23
 'Honorable Calvin Boyer was much in and about the courtroom during the course of this trial * * *.
 
 
 24
 '* * * every day of this trial Judge Boyer spent some time, on occasions several hours, in the courtroom. He even attended an evening session.
 
 
 25
 'At times during the trial Judge Boyer joined Judge Keller on the bench for whispered consultations within view of the jury, although there is nothing to suggest that the jury could hear what was being said.
 
 
 26
 '* * * at least one such consultation was designed for the guidance of Judge Keller in the making of a trial ruling.
 
 
 27
 '* * * during Judge Keller's charge to the jury, Judge Boyer sat facing the jurors within the enclosure reserved for members of the bar * * *.
 
 
 28
 '* * * the jurors knew who Judge Boyer was. The evidence also makes it very probable that they also knew that he had just completed the trial at which relator's (Darcy's) codefendants had been convicted and sentenced to death. Moreover it had been reported in the press that Judge Boyer had commended the jury for the first degree verdict against the codefendants with its mandatory death penalty.'
 
 
 29
 There was a 'rather striking manifestation of extraordinary interest in the (trial) proceedings' by Judge Boyer.
 
 
 30
 It had come 'to the jury's observation that a judge (Judge Boyer) other than the trial judge was showing much interest in the case.' (Emphasis supplied.)
 
 
 31
 Despite these significant and critical findings the majority concluded that Judge Boyer's presence and conduct in the Darcy trial fell short of the fundamental unfairness proscribed by the due process guarantee.
 
 
 32
 It went so far as to declare that 'Even if the jurors identified him (Judge Boyer) as an official who was hostile to the relator (Darcy) that would not be enough; * * * it would be necessary to show that he (Judge Boyer) had said or done something prejudicial to the defendant during his stay in the courtroom before the fact of his presence and manifest interest could raise a substantial due process question.'
 
 
 33
 I disagree with the majority's conclusion.
 
 
 34
 I believe that if the jurors identified Judge Boyer 'as an official who was hostile' to Darcy such identification in and of itself raised a due process question which must be resolved in favor of Darcy, because a 'hostile' attitude of a judge can, and almost universally does, effectively influence and guide a jury's verdict.
 
 
 35
 My opinion is based on intensive observation of juries during the ten years which I spent as presiding judge in the trial of criminal cases before I came to the appellate bench.
 
 
 36
 I know from first-hand experience how the members of a jury, consciously or subconsciously, are ever on the alert to glean from what is judge has said or done during the course of a trial his opinion as to the guilt or innocence of a defendant. Jurors look, figuratively speaking to every spoken word, to every nuance and inflection, to every gesture, no matter how slight or unintentional, to the extent and tenor of judicial participation in examination or cross-examination, to anything which could conceivably be construed as a straw in the wind as to the judicial 'attitude'.
 
 
 37
 The United States Supreme Court, the Supreme Court of Pennsylvania and other appellate courts, have time and again emphasized the existence of this significant judge-jury relationship.
 
 
 38
 'It is obvious that under any system of jury trials the influence of the trial judge on the jury is necessarily and properly of great weight, and that his lightest word or intimation is received with deference, and may prove controlling.' Starr v. United States, 1894, 153 U.S. 614, 626, 14 S.Ct. 919, 923, 38 L.Ed. 841; Quercia v. United States, 1933, 289 U.S. 466, 470, 53 S.Ct. 698, 77 L.Ed. 1321.[6] (Emphasis supplied.)
 
 
 39
 The Supreme Court of Pennsylvania has similarly appraised the judge-jury relationship, stating, in the leading case of Commonwealth v. Myma, 1924, 278 Pa. 505, 508, 123 A. 486, 487: 'The practice of a judge entering into the trial of a case as an advocate is emphatically disapproved. The judge occupies an exalted and dignified position; he is the one person to whom the jury, with rare exceptions, looks for guidance, and from whom the litigants expect absolute impartiality. An expression indicative of favor or condemnation is quickly reflected in the jury box and at the counsel table. To depart from the clear line of duty through questions, expressions, or conduct, contravenes the orderly administration of justice. It has a tendency to take from one of the parties the right to a fair and impartial trial, as guaranteed under our system of jurisprudence.' To the same effect see Commonwealth v. Trunk, 1933, 311 Pa. 555, 566, 167 A. 333; Sorrentina v. Graziano, 1941, 341 Pa. 113, 119, 17 A.2d 373; Schlesinger's Petition, 1951, 367 Pa. 476, 81 A.2d 316; Commonwealth v. Claiborne, 1953, 175 Pa.Super. 42, 50, 102 A.2d 900.[7] (Emphasis supplied.)
 
 
 40
 Evidencing its insistence upon strict conformity with these expressed standards governing judicial office, the Supreme Court of Pennsylvania has held that their breach constitutes a deprivation of 'due process'.
 
 
 41
 It did so in DiBona v. Philadelphia Transportation Co., 1947, 356 Pa. 204, 216, 51 A.2d 768, 774, stating: 'Judges should never forget that 'the first and most essential element in a jury trial is a wise, learned, impartial and competent judge.' See Martin v. Philadelphia Gardens, Inc., 348 Pa. 232, 236, 35 A.2d 317, and Commonwealth v. Brown, 309 Pa. 515, 521, 164 A. 726, 86 A.L.R. 892. A litigant who is denied this 'essential element' is deprived of 'due process of law." (Emphasis supplied.)
 
 
 42
 It may be said that the foregoing is inapposite in the instant case because Judge Boyer was not the 'presiding judge' at Darcy's trial. On that score it need only be pointed out, as the majority found, that Judge Boyer time and again 'sat' on the bench with Judge Keller during the course of the trial and that he 'At times * * * joined Judge Keller on the bench for whispered consultations within view of the jury' and further, 'at least one such consultation was designed for the guidance of Judge Keller in the making of a trial ruling.' (Emphasis supplied.)
 
 
 43
 Coming now to the majority's statement that in the absence of proof that '(Judge Boyer) had said or done something prejudicial * * * during his stay in the courtroom', there could be no finding of denial of due process:
 
 
 44
 In my opinion the record more than amply demonstrates that Judge Boyer 'had done something prejudicial' to Darcy. The majority's own finding of his 'rather striking manifestation of extraordinary interest in the proceedings' and its implicit recognition of the jury's identification of Judge Boyer as 'hostile' establish that Judge Boyer 'had done something prejudicial'.
 
 
 45
 If more is needed the record supplies it.
 
 
 46
 The jury 'knew' who Judge Boyer was. They 'knew' he had presided at the trial of Darcy's confederates and they knew that he had praised the jury for finding them guilty and sentencing them to death.[8] They 'knew' Judge Boyer 'was showing much interest in the case'. They 'knew' the extent of his 'interest' from the fact that he was in daily attendance at the trial and that 'he even attended an evening session'. They 'knew' it from the fact of his 'whispered consultations' with Judge Keller and they 'knew' it from the fact that he sat, hours at a time, in a specially-placed chair on the front row, directly facing the jury and within its view.
 
 
 47
 Sitting there in that chair, staring the jury in the eye, as it were, Judge Boyer was to it an uncompromising watchful omnipresence; a stern sentinel of justice; an 'overseer judge' over the jury itself, dedicated to the meting out of the fullest measure of penalty to the defendant; a silent but eloquent extra-judicial aid to the prosecuting attorney.
 
 
 48
 I cannot conceive of a more striking example of judicial 'guiding' of a jury's verdict-- I refer particularly to the jury's imposition of the death sentence-- than was so glaringly apparent in the instant case. It falls squarely within the reach of the prevailing rule proscribing undue judicial influence on a jury, and constituted fundamental unfairness violative of the due process clause. DiBona v. Philadelphia Transportation Co., supra.
 
 
 49
 The duty of this court to give consideration to the 'totality of facts in a given case' where the due process clause is invoked, was clearly spelled out by the Supreme Court of the United States in Betts v. Brady, 1942, 316 U.S. 455, 62 S.Ct. 1252, 1256, 86 L.Ed. 1595. (Emphasis supplied.)
 
 
 50
 'The phrase (due process) formulates a concept less rigid and more fluid than those envisaged in other specific and particular provisions of the Bill of Rights. Its application is less a matter of rule. Asserted denial is to be tested by an appraisal of the totality of facts in a given case. (316 U.S. at page 462, 62 S.Ct. at page 1256.)
 
 
 51
 'As we have said, the Fourteenth Amendment prohibits the conviction and incarceration of one whose trial is offensive to the common and fundamental ideas of fairness and right * * *.' 316 U.S. at page 473, 62 S.Ct. at page 1262. (Emphasis supplied.)
 
 
 52
 Again, in Johnson v. Zerbst, 1938, 304 U.S. 458, at pages 465-466, 58 S.Ct. 1019, at page 1023, 82 L.Ed. 1461, the Supreme Court said:
 
 
 53
 'True, habeas corpus cannot be used as a means of reviewing errors of law and irregularities-- not involving the question of jurisdiction-- occurring during the course of trial; and the 'writ of habeas corpus cannot be used as a writ of error.' These principles, however, must be construed and applied so as to preserve-- not destroy-- constitutional safeguards of human life and liberty. The scope of inquiry in habeas corpus proceedings has been broadened-- not narrowed-- since the adoption of the Sixth Amendment.' (Emphasis supplied.)[9]
 
 
 54
 I come now to the alleged note-passing incident which the majority indicated it would have considered 'such improper partisan participation by Judge Boyer in the trial' as to come within the reach of the due process clause had it been established by the evidence.
 
 
 55
 I have deferred discussion of this phase of the case because of my view that independent of the note-passing incident the record sufficiently disclosed that Judge Boyer had 'done something' prejudicial in violation of the due process guarantee.
 
 
 56
 The sum total of the majority's view with reference to the note-passing incident is that while 'The government's showing (that it had not occurred) was less than overwhelming * * * yet it was not unsubstantial' and since 'the district court made a specific finding that this alleged occurrence did not take place * * * we think that we are not justified in disturbing that finding.'
 
 
 57
 I disagree with the majority.
 
 
 58
 Three witnesses for Darcy testified that during Judge Keller's charge Judge Boyer sat in his 'special chair' with the district attorney seated nearby; that Judge Boyer passed a note to the district attorney and the latter thereupon arose and addressed Judge Keller with respect to a point in his charge.
 
 
 59
 The district attorney[10] and his assistant[11] ] testified that during the course of Judge Keller's charge they did not sit at their customary places at the Commonwealth's counsel table which was about for feet or so from the jury, but instead sat at the press table some 15 feet distant (on the opposite side of the room); the chairs in which they sat at the press table were some eight feet or so away from the 'special chair' reserved for Judge Boyer's use; they had 'no recollection' whether Judge Boyer was at the time seated in his chair; they had 'no recollection' whether Judge Boyer had passed a note to the district attorney as testified to by the relator's witnesses.
 
 
 60
 The district attorney also testified that he had 'no recollection' as to whether Judge Boyer had 'assisted him' in the Darcy trial.[12]
 
 
 61
 It was on the basis of this 'no recollection' testimony that the District Court Judge made the factual finding that the note-passing incident had not occurred and that Judge Boyer had not at any time assisted the district attorney.
 
 
 62
 In my opinion, in a case where a man's very life is at stake, non-negating testimony such as was given by the district attorney and his assistant cannot be regarded as affording 'substantial' basis for a fact-finding such as was made by the District Court in the instant case.[13]
 
 
 63
 One cannot simply shrug off with a 'no recollection' statement affirmative testimony of such an extraordinary event as the passing of a note by a judge to a prosecuting attorney in a murder trial.
 
 
 64
 Note-passing by a judge, to a district attorney, can scarcely be regarded as a casual, routine, every-day, run-of-the-mine occurrence. The implication of such an occurrence could scarcely escape an experienced prosecuting attorney and the event would have been indelibly inscribed upon his memory. But curiously here the district attorney had 'no recollection' as to whether it had happened or had not happened. And even more curiously, lightning seems to have struck twice, because the assistant district attorney who was admittedly sitting by his side also has 'no recollection' whether it had happened or had not happened.
 
 
 65
 It seems to me that the thread of a man's life, no matter now 'heinous' his crime, should not be snapped asunder by the erratic, dulled blade of 'no recollection'.
 
 
 66
 My resolution in this respect is reinforced by the admitted but unexplained circumstance that the district attorney and his assistant, when the trial judge began his charge to the jury, saw fit to leave their customary places at the Commonwealth table, close to the bench and only four feet from the jury, and to seat themselves some 15 feet away at the press table, which, as they said, was some eight feet from 'Judge Boyer's chair'.
 
 
 67
 In conclusion I will dwell but briefly with the majority's view that Judge Boyer's conduct was an 'occurrence-- in state procedure', immune, as such, from the reach of the due process guarantee. Implicit in the majority's discussion on this score[14] is its recognition that Judge Boyer's conduct was 'dubious' and its indication that it would have 'proscribed' it had it happened in a trial in a federal court and would have considered it as a compelling basis for granting a new trial.
 
 
 68
 Shaken down to its hard core the majority's position-- bluntly stated-- is this: Darcy was grievously hurt by Judge Boyer's conduct but we cannot help him because he was hurt on the other (the State) side of the street; otherwise stated, there is no constitutional redress for Darcy despite the fact that he was unfairly tried because it was his fate to be tried in a State court instead of a Federal court.
 
 
 69
 I do not agree.
 
 
 70
 I cannot draw as fine a line as the majority has drawn when the terminus of that line is death.
 
 
 71
 The mere circumstance that what happened to Darcy occurred in a State and not in a Federal court cannot operate to deprive him of his constitutional rights.
 
 
 72
 Judge Boyer's extraordinary and unprecedented conduct was totally foreign in every respect to the normal procedural course of a criminal trial in the Pennsylvania courts. It was not in any sense within the periphery of what may be described as the customary and normal procedure in Pennsylvania criminal trial. Its significance in its compelling impact upon the jury was of such proportion and vitality as to take it out of the category of 'state procedure'.
 
 
 73
 It is not incidental to any accepted standard of state procedure for a judge to conduct himself as Judge Boyer did in the Darcy trial. It is not incidental in Pennsylvania for a judge who has just completed a trial of a defendant's confederates and praised the jury which found them guilty and fixed death as their penalty, to participate, as Judge Boyer did, in the trial of a third confederate, presided over by the president judge of his court. It is not incidental for a judge to have a 'special chair' placed for his use on the front row of the courtroom where he is in full view of the jury and it is within his full view and for him to sit there as an extra-curricular judicial overseer.
 
 
 74
 And it is not incidental in Pennsylvania criminal trials for a judge 'to pass a note' to the district attorney.
 
 
 75
 In my opinion it can fairly be said of Judge Boyer's conduct that 'This is conduct that shocks the conscience' in violation of the due process guarantee.[15]
 
 
 76
 Its inevitable effect was to distort the trial process to the extent at least that Darcy was deprived of a possible unprejudiced jury determination that justice required only the imposition of a life sentence instead of death.[16]
 
 
 77
 Of Judge Boyer's conduct it can also be said, as the Supreme Court of the United States said in Chambers v. State of Florida, 1940, 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716:
 
 
 78
 '* * * no man's life, liberty or property (can) be forfeited as criminal punishment * * * until there (has) been a charge fairly made and fairly tried in a public tribunal free of prejudice, passion, excitement and tyrannical power.' 309 U.S. at pages 236, 237, 60 S.Ct. at page 477.
 
 
 79
 '* * * Due process of law, preserved for all by our Constitution, commands that no such practice as that disclosed by this record shall send any accused to his death.' 309 U.S. at page 241, 60 S.Ct. at page 479. (Emphasis supplied.)
 
 
 80
 Upon consideration of the 'totality of facts', evidenced by the Darcy trial record, as directed by the Supreme Court of the United States in Betts v. Brady, supra (316 U.S. 455, 62 S.Ct. 1262), and applying the rule there stated that '* * * the Fourteenth Amendment prohibits the conviction * * * of one whose trial is offensive to the common and fundamental ideas of fairness and right',[17] I am of the opinion that the judgment of the District Court should be reversed and the prayer of the relator granted.
 
 
 81
 McLAUGHLIN, Circuit Judge, authorizes me to state that he concurs with the views expressed in the foregoing dissent.
 
 
 82
 BIGGS, Chief Judge (dissenting).
 
 
 83
 On reviewing the record in this case I cannot avoid an abiding conviction that the judicial process under which Darcy was tried was so distorted by circumstances, both in and out of the courtroom, as to result in fundamental unfairness. The brutal crime committed by Darcy, Foster, Zeitz and Capone had angered the citizens of Bucks County. By editorials, news stories and comments the press prejudged Darcy's case and prejudiced the minds of the citizenry against him. I cannot believe that all members of the jury remained uninfluenced by these publications.
 
 
 84
 Though Darcy had been granted a separate trial pursuant to the Pennsylvania Act of March 31, 1860, 19 P.S.Pa. § 785, the severance was rendered worthless when his trial was proceeded with only three days after that of Foster and Zeitz. Under the circumstances a change of venue or a delay in putting Darcy on trial was requisite to fairness.
 
 
 85
 Judge Boyer's preoccupation with Darcy's trial was intense. He had been on the bench for many years and was a man of great weight in the community. He had complimented the jury at the close of the trial of Foster and Zeitz for imposing the death penalty and this fact had been widely publicized immediately preceding the commencement of Darcy's trial. From his repeated visits to and his behavior in the courtroom the members of the Darcy jury, with reason, could have inferred that he desired to indicate his belief and his desire that Darcy, like Foster and Zeitz, should be found guilty and that the penalty of death should be imposed upon him by the jury: that such was the belief and the desire of the judicial authorities of Bucks County. Though in theory a judge does not control the decisions of juries, judicial attitudes have great influence on jurors. Fairness cannot condone Judge Boyer's conduct.
 
 
 86
 The foregoing amounts to a denial of due process. A writ of habeas corpus should issue in this case and Darcy should be granted a new trial. The grant of the writ will not prevent him from being tried again for he cannot successfully plead double jeopardy.
 
 
 
 [1]
 18 P.S. § 4701. 'Whoever is convicted of the crime of murder of the first degree is guilty of a felony and shall be sentenced to suffer death in the manner provided by law, or to undergo imprisonment for life, at the discretion of the jury trying the case, which shall fix the penalty by its verdict.'
 
 
 [2]
 Concurring opinion of Mr. Justice Frankfurter in Malinski v. People of State of New York, 1945, 324 U.S. 401, 414, 416, 417, 65 S.Ct. 781, 787, 89 L.Ed. 1029
 
 
 [3]
 Quotation is from a first page article in the 'Doylestown Daily Intelligencer' in Saturday morning June 5th carrying an account of the jury's verdict the preceding day. It was captioned 'Judge Boyer Praises Jury For Verdict Condemning 2 Killers To Electric Chair'. (Relator's Exhibit No. 78.)
 
 
 [4]
 Under Pennsylvania law 'severances' are granted as a matter of absolute right when applied for by a defendant in a murder case. They are designed to grant the defendant a 'separate' trial. It is interesting to note that the majority in noting that Darcy had been placed on trial only three days after conclusion of the trial of his confederates had this to say:
 'The situation certainly would have justified a decision to wait a while before trying the relator, or else to try him in another community if trial immediately after the conviction of his confederates was deemed important. We may be persuaded that in the circumstances it would have been wise to take such precautions, yet not be convinced that failure to follow the wiser course was a denial of the essence of fair trial. The due process concept does not embrace all that a very careful and perceptive judge might do to protect a trial against emotional factors.'
 
 
 [5]
 I imply no criticism of the newspaper, radio or television coverage of the trial of Darcy's confederates or his own, or of the events which preceded them
 
 
 [6]
 We applied the principle stated in United States v. Link, 2 Cir., 1953, 202 F.2d 592, 595
 
 
 [7]
 The United States Court of Appeals for the Second Circuit in United States v. Brandt, 1952, 196 F.2d 653, 656 expressed a similar view with reference to the judge-jury relationship, stating: 'Because of his proper power and influence it is obvious that the display of a fixed opinion as to the guilt of an accused limits the possibility of an uninhibited decision from a jury of laymen much less initiated in trial procedure than he. He must, therefore, be on continual guard that the authority of the bench be not exploited toward a conviction he may privately think deserved or even required by the evidence.' (Emphasis supplied.)
 
 
 [8]
 The voir dire examination of the jurors in the Darcy case disclosed that 89 percent of them had read the newspaper accounts of the trial of Darcy's confederates
 
 
 [9]
 'As applied to a criminal trial, denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice. In order to declare a denial of it we must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevent a fair trial.' Lisenba v. People of State of California, 314 U.S. 219, 236, 62 S.Ct. 280, 290, 86 L.Ed. 166 (1941). (Emphasis supplied.)
 
 
 [10]
 Testimony of District Attorney Biester-- N.T. pp. 888-89:
 'Q. Do you recall-- strike that. During the charge of the Court will you tell us, please, what you recall of the charge so far as your location in the courtroom is concerned? A. My best recollection is that when the charge began, or very early in the charge, Mr. Curtin and I retired to the seats which are in front of the table nearest to the right of the sitting Court.
 'Q. Is that the table which has been identified by some persons as being a press table? A. I heard Mr. Curtin refer to it in language that might be assumed to be a press table. That is the table I am referring to.
 'Q. And were you seated there with any other person? A. Mr. Curtin was there with me. I, of course, don't recall whether we were there for every moment of the charge, but my recollection is that we were there for a major part of the charge.
 'Q. Do you have any recollection of Judge Boyer being present in the courtroom during any portion of the charge? A. I have not.
 'Q. There has been testimony to the effect that during the charge a note was written and passed by Judge Boyer to you. Now, do you have any recollection of any such incident? A. No recollection whatsoever.'
 
 
 [11]
 Testimony of Assistant District Attorney Curtin-- N.T. p. 713-14-15, 21
 'Q. How far was the Commonwealth's table from the nearest juror? A. The front of the Commonwealth's table would be about four to five feet from the front of the nearest juror-- the front of the chair of the nearest juror.
 'Q. And how far was it from the Commonwealth's table to the-- strike that. Was there a table to the rear of the Commonwealth's table? A. There was.
 'Q. And what was the purpose of that table? A. That was a table where the reporters constantly sat and where they were seated during this trial when they were there.
 'Q. Can you give us any estimate of the distance between the Commonwealth's table and the table which, I believe, you have referred to as being used by members of the press? A. I would say there was at least fifteen feet separating those two tables.
 'Q. Now, Mr. Curtin, do you recall where Mr. Biester was stated during the charge of the Court? A. To the best of my recollection, sir, both Mr. Biester and I were seated in two of the chairs in the first of the two rows of chairs which were immediately in front of the reporters table.
 'Q. Do you recall whether there was anyone sitting at the Commonwealth's table during the charge of the Court? A. I believe that I went to it for a few minutes but, to the best of my recollection, the Commonwealth's table had no one seated at it during most of Judge Keller's charge.
 'Q. Do you recall seeing Judge Boyer in the courtroom during the Court's charge? A. I have no recollection whatsoever of Judge Boyer being in the courtroom during the charge of Judge Keller.
 'Q. Do you have any recollection of any note having been handed by Judge Boyer to Mr. Biester at any time during the charge of the Court? A. I have absolutely no recollection of any note being handed to Judge-- to District Attorney Biester at any time during the charge of the Court.
 'Q. Now what you called the reporters table, is that the one that is between your table and the body of the courtroom? A. No, you are pointing to the defendant's table there.
 'Q. Defendant's table, all right. Then the reporters table was here-- you said some distance-- I think you said about eight feet from the chair marked 'Judge Boyer'? A. About eight feet from the front of the chair marked 'Judge Boyer' to the back of the chair behind the reporters table; eight or ten feet.'
 
 
 [12]
 N.T. p. 896:
 'Q. At any time during the Darcy trial did Judge Boyer assist you in any way in the presentation of the evidence in the trial of the case? A. I have no recollection of such a situation at all, Mr. Van Artsdalen.'
 
 
 [13]
 The testimony disclosed that it was Zeitz, one of Darcy's confederates who had killed the deceased by one of two bullets which he fired in the course of their 'get-away' from the scene of the hold-up; that Darcy had not fired his gun at the time. Darcy then was 22 years old. These facts, it is urged, might have been taken into consideration by the jury-- at least to the extent of imposing a life sentence-- had it not been 'coerced' by Judge Boyer
 
 
 [14]
 'It is established constitutional doctrine that our limited function in correcting fundamental impropriety in state trials challenged under the due process clause makes it necessary that we leave alone many dubious occurrences in state procedure which we would proscribe if they should happen in a federal court.'
 
 
 [15]
 Rochin v. People of California, 1952, 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183
 
 
 [16]
 See Note 13
 
 
 [17]
 In Buchalter v. People of State of New York, 1943, 319 U.S. 427, 429, 63 S.Ct. 1129, 1130, 87 L.Ed. 1492, the late Mr. Justice Roberts stated the applicable rule as follows:
 'The due process clause of the Fourteenth Amendment requires that action by a state * * * must be consistent with the fundamental principles of liberty and justice which lie at the base of our civil and political institutions, which not infrequently are designated as 'the law of the land."
 To the same effect see Rochin v. People of California, 1952, 342 U.S. 165, 169, 72 S.Ct. 205, 208, 96 L.Ed. 183 wherein it was stated:
 'Due process of law is a summarized constitutional guarantee of respect for those personal immunities which, as Mr. Justice Cardozo twice wrote for the Court, are 'so rooted in the traditions and conscience of our people as to be ranked as fundamental', Snyder v. Commonwealth of Massachusetts, 291 U.S. 97, 105, 54 S.Ct. 330, 332, 78 L.Ed. 674, or are 'implicit in the concept of ordered liberty'. Palko v. State of Connecticut, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288. * * *'