## UNITED STATES ᴇх ʀᴇʟ. DARCY *v.* HANDY, WARDEN, ᴇᴛ ᴀʟ.

No. 323.  Argued May 1–2, 1956.—Decided June 11, 1956.

*Charles J. Margiotti* argued the cause for petitioner. With him on the brief was *Morton Witkin.*

*Frank P. Lawley, Jr.,* Deputy Attorney General of Pennsylvania, argued the cause for respondents. With him on the brief were *Herbert B. Cohen,* Attorney General, and *Donald W. Van Artsdalen.*

MR. JUSTICE BURTON delivered the opinion of the Court.

The question before us is whether the accused, who is under a sentence of death, imposed by a Pennsylvania court and jury for murder committed during the course of an armed robbery, was tried under such prejudicial circumstances and improper influences that he was denied the due process of law guaranteed by the Fourteenth Amendment to the Constitution of the United States. The charges in this federal habeas corpus proceeding are that an atmosphere of hysteria and prejudice prevailed at the state trial, including the prejudicial conduct and frequent presence in the courtroom of another judge of the same court, who recently had presided over a trial of two associates of petitioner and which had resulted in a like conviction and sentence for the murder committed. For the reasons hereafter stated, we agree with the considered judgments of the state court, *Pennsylvania ex rel. Darcy* v. *Claudy,* 367 Pa. 130, 79 A. 2d 785; the Federal District Court, 130 F. Supp. 270; and the Court of Appeals, 224 F. 2d 504; holding that the accused was not denied due process of law.

Late on December 22, 1947, petitioner Darcy and three associates, Foster, Zeitz and Capone, armed with revolvers, held up a tavern in Feasterville, near Doylestown, Bucks County, Pennsylvania.[1] During the robbery

---

[1] This statement of facts and review of the relevant procedural steps in the case are taken largely from the opinion rendered in the instant case by the two judges constituting the United States District

two patrons of the tavern were shot and severely wounded. As petitioner and his companions left the scene, Zeitz fired at and killed a bystander, William Kelly. About a half hour later, petitioner and his companions committed another armed robbery in which shots also were fired but no one was injured. Before 2 a. m., they were arrested by Philadelphia police. While in that custody, they voluntarily admitted their participation not only in the above robberies but in seven others committed since November 30. In these a total of seven persons had been shot or otherwise injured.

On January 5, 1948, petitioner and his three companions were brought to Bucks County, charged with the murder of William Kelly and committed, without bail, to await action by the grand jury. On February 10, all four being present and all but one being represented by counsel of his own choice, they were severally indicted for murder. The District Attorney moved for a continuance because Foster was without counsel, and because one prosecution witness was in a critical condition from the wound received at the time of the robbery. The continuance was granted. On March 1, counsel for petitioner and Capone moved for a severance and separate trials. Judge Keller of the *nisi prius* or trial court (Court of Oyer and Terminer and General Jail Delivery of Bucks County) suggested the advisability of a combination trial, but granted the motions when counsel insisted on their right to them. On March 3, Judge Boyer, of the same court, appointed two local attorneys to represent Foster.

In March, defense counsel were advised that the Foster-Zeitz case would be called first, petitioner's case the following week, and then Capone's case.

Court for the Middle District of Pennsylvania. 130 F. Supp. 270. They conducted a full hearing on the petition for habeas corpus. It lasted eight days. More than 30 witnesses testified and much documentary evidence was introduced.

When it became apparent that the Foster-Zeitz trial, which began May 24, would continue into the week of June 1, the court directed the sheriff's office to notify the prospective jurors who had been summoned for June 1 not to appear until June 7. They were so notified and, with one exception, did not appear for duty until the latter date. For the Foster-Zeitz and petitioner's trials, the prospective jurors waited outside the main courtroom, were called in individually and were subjected to a searching examination on *voir dire*. While neither Foster, Zeitz nor petitioner exercised all of his peremptory challenges, two extra venires were called in order to complete the two juries. No jurors sat in both cases. Once accepted, the respective juries were kept together during each trial under the supervision of court officials. The jurors were not permitted to see newspapers, listen to radios, or see television programs, and were kept free from any outside influence or contact.

At no time during either the Foster-Zeitz trial or petitioner's trial was the courtroom filled to capacity and at no time was there any need for the court to call for order. No outbursts, disturbances or untoward incidents occurred in the courtroom or elsewhere in the county.[2] The proceedings were reported daily in the press and, on occasion, by radio. The reporting was factual, with some editorials.[3] The news coverage diminished a few weeks after the robbery, increased and subsided again after the grand-jury proceedings, and increased just before the trials.

In Pennsylvania, the jury fixes the penalty for murder in the first degree.[4] No question was raised as to identity or as to petitioner's participation in the robbery. The strategy of the defense in both trials was to seek to keep the punishment down to life imprisonment. On Friday,

---

[2] 130 F. Supp., at 283–285, n. 39–42.

[3] 130 F. Supp., at 285–289, n. 43–47.

[4] Purdon's Pa. Stat. Ann., 1945, Tit. 18, § 4701.

June 4, the jury in the Foster-Zeitz trial returned a verdict of guilty and fixed the penalty at death. After receiving the verdict, the trial judge, Judge Boyer, was, on June 5, quoted in the local newspaper as having said to that jury:

"'I don't see how you could, under the evidence, have reached any other verdict. Your verdict may have a very wholesome effect on other young men in all vicinities who may come to realize the seriousness of the folly in which so many young men indulge in these days. The only hope of stemming the tide of such crime by youth is to enforce the law which you have indicated by your decision.'" 130 F. Supp., at 291–292.

A few moments earlier, Judge Keller, in discharging the remainder of the May 24 panel, had, in the same courtroom, commended them for their satisfactory verdicts, the last one of which had been an acquittal on a charge of rape.

On Monday, June 7, petitioner's trial began. The court opened at 10 a. m., with both Judge Boyer and Judge Keller presiding. As usual, miscellaneous business, unrelated to the impending trial, was first disposed of by the court. Petitioner was then arraigned. He pleaded not guilty and, upon Judge Keller's direction, the selection of the jury was commenced. At various times during petitioner's trial, although it was presided over by Judge Keller, Judge Boyer was in attendance, sitting either on the bench with Judge Keller or in the courtroom within the enclosure reserved for attorneys, the parties and the press. In this connection, the Federal District Court found that—

"By long established tradition in Bucks County, each morning and afternoon at the opening of court both judges take the bench to entertain motions and

other miscellaneous matters in the Criminal, Common Pleas—law and equity—and Orphans' Court. Once this work is completed, one of the judges, if engaged in a trial in that court room, remains on the bench; the other judge leaving to perform duties in another court room or in chambers. The practice used in many Pennsylvania courts . . . was continued daily no matter what court was in session or the nature of the trial [but] not on June 4 when Judge Boyer charged the jury [trying Foster and Zeitz]; and . . . not on June 8 and 10.

"The criminal docket . . . a record of individual trials, shows both judges on the bench at 10:00 A. M. May 24 . . . 9:30 A. M. June 2 . . . 10:00 A. M. June 7 . . . . The court reporter's notes of testimony show only one instance of Judge Boyer taking any part whatsoever in the Darcy trial, i. e., during a sidebar discussion out of the hearing of the jury shortly after court convened on Saturday morning, June 12 . . . . Under consideration was a difficult question of law on the admissibility of evidence of other offenses . . . in view of the Act of July 3, 1947, P. L. 1239, 19 P. S. Pa. § 711 note. Judge Boyer indicated his thinking on the matter. Upon objection by counsel the discussion ended; Judge Keller ruled; Judge Boyer left the bench shortly after and did not return during the remainder of the trial. It may be that during the Foster-Zeitz trial Judge Keller shortly after 9:30 A. M. June 2 . . . listened to but did not express any opinion during a similar discussion.

"Honorable Hiram H. Keller . . . who presided . . . throughout the trial, has certified . . . that after the miscellaneous business was completed, 'On several occasions . . . Judge Boyer remained for brief periods while evidence was presented

. . .', and that with the exception of the incident [noted above], 'At no other time, during the course of the trial, did Judge Boyer assist, volunteer to assist, or make any suggestions to or otherwise aid the undersigned in the trial of this case.'

"The District Attorney . . . testified, and we find as a fact, that Judge Boyer did not at any time during the Darcy trial assist, attempt to assist, make any suggestion to or in any other manner aid the Commonwealth in the prosecution of the case against David Darcy; that Judge Boyer did not pass any note or message of any kind to the District Attorney in connection with the trial for the use of the District Attorney or Judge Keller.

"On several occasions during the Darcy trial—not on Friday evening or during the charge of the court on Monday, June 14—Judge Boyer sat for brief intervals on a chair just inside the court room door from the judges' chambers, apparently listening to the proceedings. . . .

"During the Darcy trial Judge Boyer did not at any time sit at or near the table reserved for the press; at or near the table reserved for the District Attorney; at no time did Judge Boyer sit on a chair next to or anywhere near a chair occupied by the District Attorney.

"Throughout the trial, the only chairs occupied by the District Attorney or his assistant were at the table reserved for that purpose, or in chairs immediately in front of the table reserved for the press.

"At no time other than that noted [above] did Judge Boyer take any part whatsoever in the proceedings of the Darcy trial." 130 F. Supp., at 296–297.

On Monday, June 14, petitioner's case went to the jury. It returned a verdict of guilty and fixed the penalty at death. The subsequent proceedings in this case, extend-

ing over eight years, are summarized in the margin.[5] Those proceedings uniformly sustained the State, but we granted certiorari to review the charge now made by petitioner that he was denied due process. 350 U. S. 872.

Petitioner's charge is that (a) the news coverage of the robbery and of the proceedings prior to his trial, including the Foster-Zeitz trial and Judge Boyer's reported remarks to the jury in that case, created such an atmosphere of hysteria and prejudice that it prevented him from having a fair trial, (b) notwithstanding that he was granted a severance, he was forced to go to trial within one week of the trial of his companions, Foster and Zeitz, and (c) in the light of (a) and (b) above, Judge Boyer's presence and participation in petitioner's trial prevented him from

---

[5] Motion for new trial, denied; appeal to the Pennsylvania Supreme Court, conviction affirmed, 362 Pa. 259, 66 A. 2d 663; petition for habeas corpus to the Pennsylvania Supreme Court, denied, without opinion; petition for certiorari to review those judgments, denied, 338 U. S. 862; applications to the Pennsylvania Board of Pardons for commutation of sentence, denied; second petition for habeas corpus to the Pennsylvania Supreme Court filed April 2, 1951, raising for the first time the constitutional questions now before us; on the same day, a similar petition for habeas corpus filed in the United States District Court for the Middle District of Pennsylvania; second petition for habeas corpus to the Pennsylvania Supreme Court, denied, 367 Pa. 130, 79 A. 2d 785 (after passing on the merits of the petition); petition to the United States District Court, dismissed, 97 F. Supp. 930; petition for certiorari to review the Pennsylvania Supreme Court's denial of the writ of habeas corpus, denied, 342 U. S. 837; appeal to the United States Court of Appeals for the Third Circuit from the District Court's dismissal of the petition for habeas corpus, heard en banc, reversed by a divided court and remanded for hearing, 203 F. 2d 407; after rehearing denied by the Third Circuit, the State sought certiorari in this Court, denied, 346 U. S. 865; after hearing before Chief Judge Watson and District Judge Murphy, of the District Court, petition for habeas corpus denied, 130 F. Supp. 270; on appeal to the Third Circuit, heard en banc, the District Court's judgment was affirmed, 4–3, 224 F. 2d 504. Throughout these proceedings, petitioner has been represented by competent counsel.

462

being fairly tried since Judge Boyer, in effect, acted as an "overseer judge" and effectively guided and influenced petitioner's jury.

Petitioner has been given ample opportunity to prove that he has been denied due process of law. While this Court stands ready to correct violations of constitutional rights, it also holds that "it is not asking too much that the burden of showing essential unfairness be sustained by him who claims such injustice and seeks to have the result set aside, and that it be sustained not as a matter of speculation but as a demonstrable reality." *Adams* v. *United States ex rel. McCann,* 317 U. S. 269, 281. See also, *Buchalter* v. *New York,* 319 U. S. 427, 431; *Stroble* v. *California,* 343 U. S. 181, 198. Justice Holmes, speaking for a unanimous Court in *Holt* v. *United States,* 218 U. S. 245, 251, cautioned that "If the mere opportunity for prejudice or corruption is to raise a presumption that they exist, it will be hard to maintain jury trial under the conditions of the present day."

We have examined petitioner's allegations, the testimony and documentary evidence in support thereof, and his arguments. We conclude that the most that has been shown is that, in certain respects, opportunity for prejudice existed. From this we are asked to infer that petitioner was prejudiced. The law recognizes that prejudice may infect any trial and provides protection against it. For example, provision is made for the *voir dire* examination and for challenges of jurors who indicate that they may be prejudiced. In addition, a substantial number of peremptory challenges is allowed. This gives to each party a large discretion to exclude jurors deemed objectionable for any reason or no reason. Another protection is available through the severance of the trials of the defendants and through continuances of the respective trials. Still another means of protection is that of a change of venue for proper cause.

In the instant case, notwithstanding the fact that competent counsel for petitioner did not use all of his peremptory challenges after a searching examination of prospective jurors on *voir dire,* and did not seek a continuance of the trial or a change of venue, petitioner asks this Court, in effect, to infer that the news coverage of the robbery and proceedings prior to petitioner's trial, including the Foster-Zeitz trial, created such an atmosphere of prejudice and hysteria that it was impossible to draw a fair and impartial jury from the community or to hold a fair trial. The failure of petitioner's counsel to exhaust the means provided to prevent the drawing of an unfair trial jury from a community allegedly infected with hysteria and prejudice against petitioner, while not dispositive, is significant.[6] Here, the issue was not raised until almost three years after the trial, yet we are asked to read the news reports and the testimony as to other incidents and to find, contrary to the Supreme Court of Pennsylvania and two federal courts, that these reports and incidents did create such an atmosphere that it infected the jurors and deprived petitioner of a fair trial on the evidence presented to them. We see no justification in the record to warrant our so finding.

On the other hand, the Federal District Court, familiar with the local conditions, has found, on the evidence before it, that petitioner's trial was conducted in a calm judicial manner, without any disturbances, and that the news coverage was "factual, with an occasional descriptive word or phrase, and, on occasion, words of compassion or commendation." 130 F. Supp., at 286. It has found that counsel for petitioner conducted a thorough *voir dire* examination. In all, 49 persons were challenged for cause or excused—14 for fixed opinion or bias. Petitioner used 10 of the 20 peremptory challenges allowed him,

---

[6] See *Stroble* v. *California,* 343 U. S. 181, 193–194.

the Commonwealth only eight. The record shows that counsel for petitioner was informed almost three months before petitioner's trial that petitioner would be tried immediately after Foster and Zeitz, but he made no motion for a continuance [7] or for a change of venue. Of the prospective jurors called for service at petitioner's trial, only one was found to have attended the Foster-Zeitz trial and that person was challenged for cause. There is nothing in the record to show, as a "demonstrable reality," that petitioner was denied due process of law because of community hysteria and prejudice. The District Court's findings, sustained by the Court of Appeals and supported by the record, dispose of this aspect of the case.

Nor do we conclude that petitioner was prevented from obtaining a fair jury trial by reason of Judge Boyer's commendatory remarks to the Foster-Zeitz trial jury, reported in the local press two days before petitioner's trial. At most, petitioner has shown that this created a possible opportunity for prejudice. There is no merit in petitioner's claim that he was "forced" to trial immediately after the Foster-Zeitz trial or in his claim that the trial judge should have, *sua sponte,* changed the venue or continued the trial. See 130 F. Supp., at 292–295.

Petitioner's remaining claim rests largely upon facts which the District Court has found against him. Petitioner alleges that, during the charge to the jury, Judge Boyer passed a note to the District Attorney, who immediately interposed an objection to Judge Keller's charge, and the latter allegedly corrected himself. Petitioner argues that the testimony of the District Attorney and his assistant that they had no recollection of such an incident is insufficient to offset the direct testimony of petitioner's

---

[7] Counsel for Capone sought and was granted a continuance on May 17, 1948, one week prior to the Foster-Zeitz trial.

witnesses that the incident did occur, that Judge Boyer did sit at the table reserved for the press, and that the District Attorney and his assistant sat immediately in front of Judge Boyer. The issue thus raised is largely one of credibility to be determined by the trier of the facts. *Hawk* v. *Olson,* 326 U. S. 271, 279. The District Court's positive findings on this aspect of the case (at 458–460, *supra*) find support in the record. We are not justified in upsetting them.

We also are asked to find that the presence of Judge Boyer on the bench at the beginning of each session of the court, his remaining on the bench after the miscellaneous business was disposed of, and his presence thereafter in the courtroom created such a prejudicial effect upon the jury that it became impossible for it to return a fair verdict and penalty. Except for the one incident where Judge Boyer participated in a sidebar conference out of the hearing of the jury,[8] the District Court found that he did not participate in petitioner's trial. Petitioner's counsel objected to Judge Boyer's participation in the sidebar conference[9] and he left the bench shortly thereafter.

Petitioner makes much of the fact that the majority opinion of the Court of Appeals states that Judge Boyer's conduct showed a "striking manifestation of extraordinary interest in the proceedings," and that the jury knew who he was and it was "very probable" they knew that he had just completed the Foster-Zeitz trial. 224 F. 2d, at 508.

---

[8] The ruling made following this incident was in favor of petitioner, since the statements of prior offenses then before the court were admitted for a purpose more limited than the Pennsylvania Supreme Court approved on appeal. See *Pennsylvania* v. *Darcy,* 362 Pa. 259, 283, 66 A. 2d 663, 675.

[9] The ground for this objection was that Judge Boyer had "disqualified himself from sitting in on this case, and it is prejudicial to the defendant [petitioner]." See 130 F. Supp., at 296, n. 54.

We agree with the Court of Appeals that petitioner attaches too much significance to Judge Boyer's conduct. Judge Boyer's presence on the bench, particularly in the light of the long-established practice for both judges to sit on the bench at the beginning of each session to dispose of miscellaneous business, did not amount to a denial of due process. Nor did his subsequent presence on the bench or in the courtroom make out a denial of due process. Under the cases cited earlier,[10] petitioner must show that he was prejudiced in some way by the judge's presence. Aside from the sidebar conference and the contested note-passing incident, petitioner relies upon Judge Boyer's statement to the Foster-Zeitz jury and his subsequent remarks made on June 11, in another case, in sentencing another Philadelphia youth, to show that Judge Boyer was "hostile" to petitioner and that the jury recognized such hostility. But the remarks on June 11 could not have prejudiced petitioner's jury since that jury had no access to any source of news that reported the incident. Petitioner, thus, is left with Judge Boyer's commendatory remark to the Foster-Zeitz trial jury. This, read in its proper context and examined in the light of Judge Keller's remarks made to the remainder of the jury panel, does not raise a substantial due process question. Petitioner seeks to have this Court speculate that the jurors knew that Judge Boyer had made this statement and that they were prejudiced by it or by Judge Boyer's presence. We can no more speculate on this aspect of the case than on the others. Petitioner's counsel must have been aware of Judge Boyer's statement and of its possible effect, if any, on the jury, and the possible effect of Judge Boyer's manifestation of interest. However, he took no action to prevent this possibility from infecting petitioner's trial. Accordingly, we may as well

---

[10] See cases cited at 462, *supra*.

speculate that he did not deem it necessary to take any such action because the possibility of prejudice was too remote to justify it. It is not necessary for this Court to enter into such speculations. Petitioner has not sustained the burden resting upon him to show that his trial was essentially unfair in a constitutional sense and that the several courts which have reviewed it are all in error. The judgment of the Court of Appeals, therefore, is

*Affirmed.*

Mr. Justice Harlan, whom Mr. Justice Frankfurter and Mr. Justice Douglas join, dissenting.

I would reverse the judgment below on the basis of Judge Boyer's conduct. The central facts against which this conduct must be viewed are that: (1) Zeitz, not petitioner, did the actual killing on which petitioner's trial was based, and (2) petitioner's participation in the robbery being uncontested, the only real issue at his trial was whether he should suffer the death penalty or life imprisonment, which, under the Pennsylvania statute, was a question for the jury. If these facts be kept in mind, I think that the Court, in holding that the case presents no violation of due process, has disposed of Judge Boyer's conduct too lightly.

The Court states that the general atmosphere of the trial was not prejudicial, that Judge Boyer's remarks to the Foster-Zeitz jury raise no substantial due process questions, and that we should not disturb the District Court's findings that the alleged note-passing incident did not occur and that Judge Boyer's participation in the trial was limited to the "sidebar" episode. Accepting this, as I do, it does not end the matter for me, for there still remain these undisputed facts, and the inferences which I think should be drawn from them: The crime was a particularly atrocious one, and Judge Boyer shared

the community sense of outrage over it.[1]   The trial took
place in a small rural community of which Judge Boyer
had been a respected member for many years, and he was
presumably known to the jurors, at least by reputation.
Judge Boyer, as it is fair to assume the jurors knew, had
presided over the Foster-Zeitz trial in which the jury,
three days before petitioner's trial began, had returned a
death verdict against two of petitioner's associates in this
crime.[2]   Judge Boyer remained in the courtroom at peti-
tioner's trial beyond the call of duty, and his presence
there on some days after other matters had been disposed
of was wholly unexplained.   On such occasions he sat not
with the ordinary spectators, but sometimes on the bench

---

[1] In imposing sentence in a case tried during petitioner's trial,
Judge Boyer said (as reported by a local newspaper the next day):

"We don't propose to nail all our property fast here in Bucks
county just because thieves from Philadelphia want to pick up
everything which isn't being watched. . . .   What business did you
have to come up here in the first place? . . .   Have you heard
what's going on downstairs [referring to petitioner's trial]? . . .
Do you want to wind up like that? . . .   We in Bucks county are
tired of you Philadelphians who don't know how to behave.   We
have to bear the expense and we propose to stop it."

Since petitioner's jury had no access to this newspaper, these state-
ments could not have affected his trial.   But they are indicative of
Judge Boyer's sentiments, and of community reaction.

[2] The local newspaper reported the following on the day after the
Foster-Zeitz trial ended:

"JUDGE BOYER PRAISES JURY FOR VERDICT CONDEMNING 2 KILLERS
TO ELECTRIC CHAIR

·          ·          ·          ·          ·

" 'I don't see how you could, under the evidence, have reached
any other verdict,' Judge Boyer said.

" 'Your verdict may have a very wholesome effect on other young
men in all vicinities who may come to realize the seriousness of the
folly in which so many young men indulge these days.

" 'The only hope of stemming the tide of such crime by youth is to
enforce the law which you have indicated by your decision,' Judge
Boyer said."

and other times within the bar in full view of the jury. The "sidebar" conference, in which Judge Boyer participated, was in sight of the jury. Judge Boyer was in the courtroom during the court's charge. From these admitted facts, I consider that the jury must have been conscious of the unusual interest which Judge Boyer had in the case, and that it might well have concluded that he felt the defendant should be dealt with severely.

Having regard to the character of the issue with which the jury was confronted, I think these undisputed facts, and the inferences which may be drawn from them, require us to hold that the petitioner has been denied due process. I cannot say that the support lent to the prosecution by Judge Boyer's manifest interest in the trial might not have tipped the scales with the jury in favor of a death verdict, and in a capital case I would resolve that doubt in favor of a new trial. The reasons for my conclusion are those which Judge Kalodner has well stated in his dissenting opinion in the Court of Appeals, 224 F. 2d 504, 509. We should be especially scrupulous in seeing to it that the right to a fair trial has not been jeopardized by the conduct of a member of the judiciary.