Jerry Lewis **FOWLER**, Appellant,

v.

The **STATE** of Oklahoma, Appellee.

No. A–17372.

Court of Criminal Appeals of Oklahoma.

June 25, 1973.

Jones, Atkinson, Williams, Bane & Klingenberg, Enid, for appellant.

Larry Derryberry, Atty. Gen., Yvonne Sparger, Asst. Atty. Gen., Charles F. Alden III, Legal Intern, for appellee.

## OPINION

BLISS, Presiding Judge:

The appellant, Jerry Lewis Fowler, hereinafter referred to as defendant, was charged with the offense of Murder in the District Court of Oklahoma County, Case No. CRF–71–1394. The trial was transferred upon a change of venue to Garvin County where defendant was tried before a jury and convicted. Defendant's punishment was fixed at life imprisonment and

from said judgment and sentence, a timely appeal has been perfected to this Court.

At the trial, Alfonso E. Bullock, employed as a security officer for the University Medical Center of Oklahoma City, testified that he was on duty the night of June 14, 1971, at the corner of Thirteenth and Phillips in Oklahoma City. He observed a white Cadillac going back and forth on Thirteenth Street. He stated the Cadillac was "full of people," and it came by about four times. Police Officers Sheldon and Ratikan of the Oklahoma City Police Department came by in a patrol car and Bullock reported the incident to them. The Cadillac was visible at the time Bullock reported the incident to the officers.

Police Officer Charles Sheldon testified that he was on duty June 14, 1971, assigned to a scout car and was patrolling with Police Officer Ratikan. Around 11:15 p. m., he and Officer Ratikan were stopped by a University Medical Center guard and observed a white Cadillac stopped at the corner of Thirteenth and Kelly. The officers followed the Cadillac after it made a left turn on Kelly and headed north and stopped it just south of the intersection of Fourteenth and Kelly. He observed seven or eight occupants in the car, and the car pulled over almost immediately. Both officers got out, Officer Ratikan approaching the driver's side of the Cadillac, and Officer Sheldon approaching the passenger side. Officer Ratikan commenced talking to the driver, Helen Tyler. Officer Ratikan then asked Officer Sheldon to run a "29 check," which is a check to see if the car or tag is stolen or wanted. Officer Sheldon returned to the scout car, ran the check and was advised by headquarters that the car was clear. As he started back towards the Cadillac, Officer Ratikan was standing just to the rear of the driver's door. Officer Ratikan then walked towards the back of the Cadillac and told Sheldon that he had a "subject" in the back seat that was "arguing and being belligerent." There was a conflict between Officer Sheldon's testimony

at the trial and a written police report by Sheldon reflecting that Officer Ratikan had stated "We have got a 'smart-mouth' in the right rear of the car." Ratikan walked around to the right rear door of the Cadillac, opened the door of the car and told the occupant sitting in the right rear seat to step out of the vehicle. The written report stated, " * * * and Ratikan came to the right rear and got the subject out of the car."

Officer Sheldon further testified that the occupant, Raymond Fowler, brother of the defendant, stepped out. The defendant was sitting in the right front seat next to the front window. Raymond Fowler emerged from the vehicle and started slowly walking away. Officer Ratikan then placed his hand on Raymond Fowler's shoulder. Raymond Fowler jerked away and told the officer to keep his "Goddamned hands off him." As Raymond Fowler jerked away, he lunged to the ground. The officers picked Fowler back up, placed him beside the Cadillac and began to search him for weapons. Fowler broke away, striking with his elbows, and ran around the front of the automobile and then in a westerly direction across the street until he was apprehended by Officer Sheldon at the curb. As Officer Sheldon grabbed him, Fowler swung and hit the officer in the face, and they fell to the ground, Fowler lying face down. Sheldon hit Fowler twice in the small of the back with his hand. Sheldon felt something pulling from his right side and thought Fowler either had his gun or his holster. The written interview did not mention Sheldon feeling a tug on his right side. While Sheldon and Fowler were on the ground scuffling, Sheldon heard three shots. He looked over at Officer Ratikan and saw him slumping to the ground. He saw no weapon in Officer Ratikan's hand.

Officer Sheldon further testified that the shots came from the direction of the Cadillac. He saw two male Negroes running away from the vehicle. He pulled his service revolver and fired four shots at the

two fleeing suspects. One, Johnny Washington, fell to the ground wounded in the leg, and the other escaped. After Sheldon fired, he continued to wrestle with Raymond Fowler. He subdued Fowler enough to radio for an ambulance and then went over to Officer Ratikan. Sheldon asked an unknown man who had arrived at the scene to help him handcuff Fowler, which he did. Shortly thereafter, other officers arrived at the scene. Police Officer Ratikan's gun was found lying near his body and close to his holster.

Helen Elizabeth Tyler then testified that on the night in question she was driving around in her uncle's car with seven other people, including the defendant. She stated that she stopped at the stop light at Thirteenth and Kelly in Oklahoma City and then made a left hand turn. A patrol car pulled up behind her, and she pulled over. An officer got out of the car and came up to Miss Tyler who was sitting in the driver's seat. The officer asked her for her driver's license, and she replied that she had left her purse at home. While the officer was talking to her, Raymond Fowler, who was sitting in the back seat, said "Damn it, you heard her." Officer Ratikan called to his partner that he had a "smart aleck" in the back seat of the car. Ratikan then went around the car, opened the right rear door, "jerked" Raymond Fowler out of the car, "slammed him up against the car" and searched him. The next thing Miss Tyler knew, Officer Ratikan and Fowler were wrestling around on the ground. When she looked up again, Officer Sheldon and Raymond Fowler were on the opposite side of the car and across the street wrestling on the ground. She then testified she heard the defendant say, "get that ———— ————," and then the defendant got partially out of the car. Defendant placed his foot up in the seat, and Miss Tyler could only see him from his foot to his waist. When the shooting started, she saw Officer Ratikan running across the street, and she then pushed Claude Mae Gordon, the passenger sitting next to her, down in the seat.

There were conflicting statements between her testimony at trial and a certain written statement that she had given the police department approximately two hours after the incident. At the trial, she stated she did not see the defendant with the gun. In her statement to the police on the night of the crime she said, "I looked around, and Jerry Fowler had a gun." Her statement also reflected that Officer Ratikan asked Raymond Fowler to step from the car. At the trial, she said that Ratikan jerked Raymond Fowler out of the car and slammed him up against the Cadillac to search him.

Dr. Harry T. Cooper then testified that he was an osteopathic physician and surgeon and that he was called to Mercy Hospital late on the evening in question to examine, in his capacity as County Medical Examiner, a police officer who had supposedly been shot. When Dr. Cooper examined Officer Ratikan he had been dead for a short period of time. The doctor testified that Officer Ratikan had suffered a gunshot wound from a small caliber bullet. It was then stipulated that Officer Ratikan died of said gunshot wound.

Johnny Lee Washington then testified that he was riding with defendant in the Cadillac on the night in question. He stated that the defendant was in the front seat, and he was sitting in the back seat behind the driver next to the right rear door. A police car stopped them on Fourteenth and Kelly in Oklahoma City. Washington testified that he could not remember what was said between Officer Ratikan and the driver of the car and between Officer Ratikan and Raymond Fowler. Washington further testified that "I thought I seen Jerry Fowler with some kind of gun, but I couldn't be for sure." After Raymond Fowler and the police officers started scuffling beside the car, Washington got out of the car. He then testified that he got back in the car when he heard the gun shots. After the shots were fired he and Jerry Fowler started running, with Jerry Fowler in the lead.

While running away, Washington was shot in the leg, fell to the ground and then returned to the Cadillac. There were some inconsistencies between the testimony of Washington and his signed statement which was given to police on the night in question, to-wit: Washington stated the night of the crime that Jerry Fowler had a gun. He described it as a small gun, black in color. He also told police that Jerry Fowler showed his gun to everyone.

Oklahoma City Police Officer Ronald G. Calvery then testified that he arrived at the scene at approximately 11:22 p. m. and that his partner immediately went to assist Officer Sheldon in subduing Raymond Fowler. Officer Calvery went to the side of Officer Ratikan. A crowd had gathered, and an unknown person, who stated he was a nurse, started giving Officer Ratikan mouth-to-mouth resuscitation. When Officer Calvery examined Officer Ratikan he could locate no pulse. He stated that Officer Ratikan's gun was lying outside his holster next to his left side, partially under him, and that Officer Ratikan was lefthanded.

Oklahoma City Police Officer Anthony W. Hyde then testified that he was on duty the night in question and arrived at the scene at approximately 11:30 p. m. Hyde identified a billfold which he found in the front yard of a nearby house. It was stipulated that the billfold belonged to the defendant. Officer Hyde also identified three .25-caliber bullet hulls which were lying in the vicinity of the Cadillac. One was just underneath the left front door, one was five feet west of the vehicle, and one was eight feet west of the vehicle.

The court then excused the jury and held a Jackson v. Denno [1] hearing to determine whether certain statements in a confession made by the defendant after his arrest were admissible. The court ruled that the statements made by defendant prior to his having been given the Miranda warning were not admissible. However, the statements made after defendant had been advised of his constitutional rights were proper and admissible.

Police Officer Joe Robertson then testified that in response to a call he arrived at the scene at approximately 11:20 p. m.; that there were blood spots on a nearby residence, a driveway and certain trash cans. Blood was also found in the Cadillac near the right rear door and the back of the front seat on the right side.

Ray Lambert, a firearms examiner for the Oklahoma State Bureau of Investigation, then identified a .25-caliber bullet and stated that the construction of the bullet indicated it was manufactured for use in a semi-automatic weapon. Lambert also testified that a semi-automatic weapon normally ejects hulls on the right side.

Oklahoma City Police Officer B. J. Revels then testified that he was present when a projectile was removed from the body of Officer Ratikan and that the bullet introduced into evidence was one and the same projectile.

Detective Larry Yandell of the Oklahoma City Police Department then testified that on the morning of June 15, 1971, he was riding with Officer Upchurch and they approached the residence located at 3320 S.W. 17th Street, Oklahoma City, looking for the suspect, Jerry Fowler. They saw a young Negro girl standing in the doorway. Just to the right of the doorway the officer could see the shoulder and side of a head of a Negro male. As the door was opened the officer recognized the suspect, Jerry Fowler. As Fowler came outside, Officer Yandell placed him under arrest, laid him on a concrete slab which served as a porch and placed handcuffs on him. Defendant was searched and then placed in a scout car.

Officer Larry K. Upchurch of the Oklahoma City Police Department then testified that he arrived with Officer Yandell and two other officers at the above-mentioned residence. As Officer Yandell

1. Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908, 1 A.L.R.3d 1205.

and Officer Upchurch approached the front door, Officer Upchurch stated that he saw a young black female standing in the doorway behind the screen door. As the officers approached, she asked, "What do you want?". They identified themselves as police officers, and as they were walking towards the door, they asked her if she knew Jerry Fowler. She replied in the negative. Officer Upchurch stated that he could see through the screen door and observed the shoulder of a man in a maroon colored shirt. He opened the door, with his weapon in his hand, and ordered the man onto the front porch. As this person came to the door, Officer Upchurch recognized him to be the defendant, Jerry Fowler. Officer Upchurch assisted Officer Yandell in laying the defendant face down on the front porch and placing handcuffs on him. Defendant was advised of his rights at that particular time. Defendant was then taken to the scout car. Two uniformed officers sat in the front seat while the defendant and Officer Upchurch were sitting in the rear seat. Defendant was again advised of his rights, and he stated that he understood them. Over the objection of defense counsel, Officer Upchurch then testified that he asked the defendant if he had shot the police officer. Defendant stated, "Yes, I was drunk." The officer then asked defendant why he shot the police officer. Defendant stated, "I guess I just panicked." The officer then asked the defendant how many shots he had fired. Defendant stated, "Five, I think." Defendant was asked to tell what type gun he had, and he described it as a small automatic with a white handle. Defendant further stated that he had thrown the gun into the bushes in a park. Defendant directed the officers to a park, but the gun was never found. The State then rested.

The defense then called Claude Mae Gordon who testified that she was riding in the Cadillac with the defendant and others on the night of the shooting. She stated she was a passenger in the front seat between the driver and the defendant. Helen Tyler was driving, and they were stopped by the police on Kelly between Thirteenth and Fourteenth Streets. When the driver, Helen Tyler, was asked for her driver's license, she stated that she left her purse at home and everybody in the back seat started talking at once. Officer Ratikan told them to be quiet and Raymond Fowler said something which Miss Gordon could not remember. Officer Ratikan then said, "We have a smart aleck in the car" and went around to the back door, snatched it open and "snatched Ray out real rough." The officer then started searching Raymond Fowler. Miss Gordon turned to talk with the driver and when she turned back around Raymond Fowler was lying on the ground with the police officers around him. The defendant got out of the car and asked the officer not to hit his brother, and one of the officers kicked the door shut. Miss Gordon again started talking to the driver, and when she turned around Raymond Fowler and the two officers were running across the street. She stated that the officers were beating Raymond Fowler and were having "a field day." Fowler was on the ground on his stomach and attempting to turn over on his back. The witness testified that Officer Ratikan reached back on his side with his right hand. In the meantime, the defendant and Johnny Washington had gotten out of the car. The witness then heard three or four shots in rapid succession. Helen Tyler pulled the witness down in the seat. However, Miss Gordon raised up to see the officer shooting towards the car. After the shooting was over, Johnny Washington was lying on the ground yelling for one of the passengers to come help him.

On cross-examination, the District Attorney questioned Miss Gordon about inconsistencies contained in a signed statement which was given by her approximately three hours after the incident. In that statement, Miss Gordon stated as follows: Officer Ratikan had some conversation with Raymond Fowler who was sitting in the back seat. Officer Ratikan asked Ray Fowler what he said, and Fowler replied again. Officer Ratikan told Fowler to get

out of the car, but Raymond Fowler did not comply. Ratikan then told Officer Sheldon that he had a smart aleck in the back seat. Officer Sheldon approached the Cadillac from the scout car and by that time Raymond Fowler had gotten out of the car. The two officers were searching him, and Raymond Fowler broke and ran. She then saw Johnny Washington and the defendant get out of the car and heard some shots. Officer Sheldon then started shooting back, and she ducked down in the seat. Miss Gordon also stated that she saw the defendant pull a gun out of his pocket. She further stated that the defendant pulled something back on it to cock it and that is when he started shooting. She stated that Officer Ratikan fell, and the other police officer started shooting back.

A hearing was held outside of the hearing of the jury relative to the zinc oxide test which was conducted by Officer Nathan Barber on the Cadillac. The trial court ruled that the results of said test were inadmissible. In the same hearing, defense counsel also moved to introduce a paraffin test which was conducted on Johnny Lee Washington. The court held that the test was inadmissible on the ground of unreliability and rejected the offer of proof that the test reflected that traces of nitrate were found on the right hand of Johnny Lee Washington.

The defense then rested. The jury returned a verdict of guilty.

Defendant, in his first proposition of error, contends that the trial court erred in refusing to admit into evidence the negative result of a particular nitrate test made upon the automobile allegedly used by defendant as a brace in firing the fatal shot.

In the case of Born v. State, Okl.Cr., 397 P.2d 924, this Court held in the 11th paragraph of the Syllabus as follows:

"The 'paraffin test' designed to reveal whether the person tested had within recent hours fired a gun has not gained that standing in scientific recognition or demonstrated that degree of reliability to justify courts in approving its use in criminal cases."

In the instant case the District Attorney, in his opening statement suggested that the defendant fired across the hood on top of the Tyler car. Approximately six hours after the shots were fired, a police officer ran a "zinc oxide" test on the automobile to determine if nitrates were present. The test was inconclusive since there had been a heavy dew on the vehicle and "dew will cause a negative result a lot of times by dissipating the nitrate which might have been present." (Tr. 344)

Defendant argues that the negative result of the test, i. e., no nitrates were found, should have been submitted to the jury for what probative values it might have. Defendant then urges that the dermal nitrate test or "paraffin test," though not specific, is scientifically reliable enough to determine the absence of nitrate. However, the test employed on the vehicle in the instant case was not a paraffin test but a "zinc oxide" test. No authorities are cited in defendant's brief for the proposition that the results of a "zinc oxide" test should be admissible.

This Court further held in the *Born* case, supra, as follows:

" 'This opinion is based on the evident inaccuracy, even in relatively good hands, *and on the fact that the inconclusive findings noted in most of the tests done can too easily be used to offset the weight of other well documented facts of a case at trial.*' " (Emphasis added)

In the instant case, the officer performing the test testified out of the hearing of the jury that the results were inconclusive. The "zinc oxide" test has not been shown to be reliable, and the detrimental effects of admitting said results into evidence outweigh the possible beneficial results. Therefore, this Court holds that the trial court did not abuse its discretion in refusing to admit the inconclusive results into evidence, and defendant's first proposition is without merit.

■ Defendant next contends that defendant was denied a fair trial because of prejudicial pre-trial publicity, and the fact that the trial court refused to grant defendant an emergency change of venue.

The State urges that defendant has not sustained his burden of showing that the publicity in Garvin County was so massive as to render the proceedings inherently suspect; and, so failing, has further failed to show that actual prejudice existed on the part of the members of the jury.

In the instant case, of seventy-four prospective jurors examined, twenty-eight had heard about the case; ten evidenced an opinion as to defendant's guilt; and only four expressed that they had formed a positive opinion of guilt which they could not set aside in order to render a verdict based upon the evidence presented.

We, therefore, hold that defendant did not show, as a matter of law, that prejudicial publicity had so permeated Garvin County so as to render the verdict inherently suspect. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600; and Estes v. State of Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543.

An examination of the record reflects no showing by defendant that there existed actual jury prejudice, i. e., an identifiable prejudice towards the accused. It is therefore the opinion of this Court that defendant failed to sustain his burden of proof, and his second proposition of error is without merit.

■ Defendant's third proposition contends that the trial court erred in excluding two jurors for cause for opposition to capital punishment. An examination of the record reflects that the jurors on voir dire stated that they could impartially determine guilt but could not under any circumstances impose the death penalty. Both jurors were excluded for cause in conformance with Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776, which holds that the State may exclude for cause those who make it unmistakenly clear that they would automatically vote against capital punishment no matter what the evidence was; or that their attitude would prevent them from making an impartial decision as to the defendant's guilt.

Defendant argues that a jury qualified under the *Witherspoon* standards is necessarily "conviction prone." However, defendant presented no evidence that the jury in the instant case was biased in any manner. This Court has ruled specifically on this question in the recent case of Trowbridge v. State, Okl.Cr., 502 P.2d 495, wherein we held as follows:

"\* \* \* The question of the exclusion of the juror for cause based upon his scruples against the death penalty was rendered moot by the fact that the defendant received a sentence of life imprisonment. In Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed. 2d 797, Mr. Justice Stewart, speaking for the Court, stated:

'In Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776, we have held that a death sentence cannot constitutionally be executed if imposed by a jury from which have been excluded for cause those who, without more, are opposed to capital punishment or have conscientious scruples against imposing the death penalty. *Our decision in Witherspoon does not govern the present case, because here the jury recommended a sentence of life imprisonment.* The petitioner argues, however, that a jury qualified under such standards must necessarily be biased as well with respect to a defendant's guilt, and that his conviction must accordingly be reversed because of the denial of his right under the Sixth and Fourteenth Amendments to trial by an impartial jury. [Citations omitted.] We cannot accept that contention in the present case. The petitioner adduced no evidence to support the claim that a jury selected as this one was is necessarily "prosecution prone," \* \* \*' (Emphasis added)"

In the instant case there is no evidence that the jury was "conviction prone" and, therefore, we find this proposition to be without merit.

▮ Defendant's fourth contention urges that the trial court erred by restricting defendant in acting as his own co-counsel after granting defendant's motion for permission to act as his own co-counsel. The record reflects that the trial court sustained defendant's motion to act as co-counsel and then refused to allow him to make an opening statement, voir dire the jury or examine and cross-examine witnesses. Defendant did make a closing argument. Defendant argues that he sought to act as his own co-counsel for the compelling reasons that he was black and could detect racial prejudice on the part of prospective jurors and that he would effectively cross-examine witnesses since he was present with the others in the car and was, therefore, in a unique position to elicit the truth.

Under 22 O.S., § 13, a defendant in a criminal case is entitled to "be allowed counsel, as in civil actions, or to appear and defend in person *and* with counsel; * * *." (Emphasis added) The Oklahoma Constitution, Article II, § 20, provides that the defendant "shall have the right to be heard by *himself and counsel;* * * *." (Emphasis added)

In support of his contention, the defendant cites People v. Northcott, 209 Cal. 639, 289 P. 634, 70 A.L.R. 817 (1930), and the cases cited in said annotation for the proposition that the right of a defendant represented by counsel to participate in the cross-examination of witnesses must be left to the discretion of the trial court.

In People v. Mims, 160 Cal.App.2d 589, 325 P.2d 234 (1958), the Supreme Court of California in construing constitutional and statutory provisions similar to those of Oklahoma held as follows:

"* * * This means that a defendant has the right to confer with his counsel, and if he is deprived of that right prejudicial error has occurred. People v.

Zammora, 66 Cal.App.2d 166, 152 P.2d 180. *But the fact that he may defend 'in person and with counsel' does not mean that a defendant may proceed with counsel and also elect to ask questions and otherwise handle his own trial. He may have an attorney and act as his own attorney, but one or the other must be in charge of the defense. Thus, an order of the court to compel the defendant to elect to proceed either in person or by counsel is not erroneous.* People v. Northcott, 209 Cal. 639, 289 P. 634, 70 A.L.R. 806; People v. Glenn, 96 Cal. App.2d 859, 216 P.2d 457; see generally 70 A.L.R. 817." (Emphasis added)

▮ In the trial of a criminal case where the defendant is represented by counsel, one or the other must be in charge of the defense in order to preserve orderly procedure in the court. In the instant case the trial court did not abuse its discretion in restricting the participation of defendant. A complete reading of the lengthy record reflects that defendant was represented by counsel. No prejudice is shown in the record, and prejudice will not be presumed. Therefore, defendant's fourth proposition in error is without merit.

▮ Defendant's fifth proposition urges that the trial court erred in overruling defendant's motion for a mistrial based on defendant's allegation that defendant was deprived of a fair and impartial trial by the prejudicial conduct by police officers at the trial and by the trial court in permitting large numbers of police officers and patrol cars to be constantly viewed by the jury.

We do not agree with this contention. The record reflects that the trial judge made every effort to see that the proceedings were conducted in an orderly fashion. This is an inherent power of the court, and defendant wholly failed to show that the trial court's exercise of said power prejudiced defendant. On the contrary, the three officers ordered to be in the courtroom were not in uniform by order of the trial court. All police officer witnesses

were required by the trial court not to appear in uniform.

The record does reflect that the trial court ordered uniformed officers to investigate or examine all packages and parcels of anyone acting suspicious. The trial judge made it perfectly clear that said order was made to prevent possible disruption in a case having some notoriety. This, standing alone, does not amount to an abuse of discretion on the part of the trial court.

Defendant urges in his brief that the jury was materially prejudiced by the "massive armed force" of officers constantly confronting them. However, defendant offered no evidence to support his allegations. The record reflects the jury was sequestered during the trial. Nothing appears in the record to suggest that the jury witnessed any search or even knew of the presence of the officers either inside or outside the courtroom.

We, therefore, hold that the actions of the trial court amounted to a reasonable exercise of a court's inherent power to insure an orderly proceeding. No showing was made that defendant was in any way prejudiced; and the defendant's fifth proposition is without merit.

■ Defendant's sixth proposition contends that the failure of the District Attorney to deliver to defense counsel a certain police report and the results of the "zinc oxide" test, after the trial court had ordered the prosecution to deliver all exculpatory evidence or statements to defendant, prejudiced defendant's defense and deprived him of due process.

After the court had so ordered, defendant discovered that the District Attorney had in his files a police report which contained a statement of Officer Sheldon which conflicted to a certain degree with the officer's prior statements. The report showing the results of the "zinc oxide" test discussed heretofore was also discovered. Both reports were then made available to defendant.

The State contends, and defendant agrees, that the Sheldon statement's value was for impeachment purposes during the trial. The statement was, in fact, delivered to defendant and was used for impeachment purposes. Therefore, the issue is moot for the purpose of this appeal.

With respect to the "zinc oxide" test results, we have heretofore held that the results were inconclusive and inadmissible. No prejudice therefore resulted. If defendant had desired to pursue the test results further by obtaining expert witnesses in hopes of convincing the trial judge of the test's admissibility, he could have requested a continuance. No continuance was requested, and defendant cannot now be heard to complain for the first time.

This Court, for the reasons set out above, holds that defendant's sixth proposition is without merit.

■ Defendant next urges that his right to effective assistance of counsel was denied when the State intercepted and made copies of private letters from defense counsel to his client.

In the instant case, after his arrest, defendant was held without bond in the Oklahoma County jail. Defense counsel lived in Enid and wrote a letter to the defendant stating in essence that he had filed an appearance in the case, put an investigator to work on same and intended to file an injunction to keep down pre-trial publicity. The merits of the case were not mentioned. The letter was mailed to defendant at the county jail where a deputy intercepted it, made a copy and gave it to the District Attorney's office.

Defendant argues that the delivery of the copy of the letter to the prosecuting attorney constituted a deprivation of defendant's constitutional right to privately consult with and have the assistance of counsel. The State, although not condoning the actions of the deputy and the District Attorney's office, contends that a reversal is not warranted under the circumstances since defendant, although alleging a violation of due process, did not make a showing that defendant was in some way injured thereby.

A thorough examination of the record in the instant case shows that defendant did, in fact, ask for the injunction mentioned in the letter, and the injunction was granted. No actual harm was suffered by defendant, nor was his defense in any way prejudiced. This Court frowns upon the actions of the deputy and the prosecutor's office concerning the letter; however, justice would not be served by a reversal of said case without some showing of prejudice. United States v. Handy, 351 U.S. 454, 76 S.Ct. 965, 100 L.Ed. 1331. Therefore, for the reasons set out above, defendant's seventh contention is without merit.

■ Defendant's next proposition in error urges that the trial court erred in overruling defendant's motion to restrain the prosecuting attorney from inquiring of defendant, if he were to testify in his own behalf, about his prior convictions. The defense counsel argues that since the motion was overruled he could ill afford to put defendant on the stand since his record of four convictions for unauthorized use of an automobile would reasonably lead to a conviction and sentence of death. We do not agree that the trial court so erred.

In Storer v. State, 84 Okl.Cr. 176, 180 P.2d 202, this Court held as follows:

"It is well settled that a defendant the same as any other witness may be asked on cross-examination for the purpose of affecting his credibility whether he has ever been convicted of a crime, and if he denied the alleged conviction the state on rebuttal may introduce proof of such conviction. [Citations omitted]"

See also Hathcox v. State, Okl.Cr., 230 P. 2d 927, and Barry v. State, Okl.Cr., 369 P. 2d 652, and the citations recited therein.

Therefore, defendant's eighth proposition in error is without merit.

■ Defendant next contends that the trial court erred in denying defendant's motion for a daily transcript of the trial proceedings at the expense of the State. In support of said contention defendant urges that said transcript would be beneficial to defendant and his counsel for purposes of direct and cross-examination, remembering testimony, preparing requested instructions and making closing arguments.

Defendant cites People v. Chait, 69 Cal. App.2d 503, 159 P.2d 445. The California case holds, however, as follows:

"* * * Whether, in a criminal case, these proceedings shall be transcribed daily and a copy furnished the defendant is a matter properly left to the discretion of the trial court. * * *"

In the instant case, the defendant has completely failed to show any prejudice whatsoever. Defendant was ably represented and there is no apparent lack of memory. This Court, therefore, holds that the trial court did not abuse its discretion in denying defendant's motion; and defendant's ninth contention is also without merit.

Defendant next contends in his tenth proposition of error that the trial court erred in denying defendant's motion to suppress certain statements allegedly made by defendant. A reading of the lengthy record reflects that defendant was alleged to have made the statement, "I don't have the gun" to the arresting officers prior to his receiving the Miranda warning from said officers. After being arrested, handcuffed, placed in the scout car, twice advised of his Miranda rights and after acknowledging that he understood said rights, defendant, in response to the questions of Arresting Officer Upchurch, made the following statements, quoting said officer:

"The first thing that he said was, 'I don't want any trouble. I won't resist.' I then asked him if he had shot the police officer, and he stated that he did. He states, 'Yes, I was drunk.' I then asked him why he had shot the police officer, and he stated, 'I guess I panicked.' I then asked him how many times he shot at the police officer, and he stated, 'Five, I think.' I then asked him how many times the officers fired at him, and he stated, 'Four, I think.' I then asked him what type of gun that he had. He advised it was a small automatic, an automatic with white handles. I asked

him what he had done with the weapon. He advised he had thrown it in the bushes in the park. I asked him which park, and at that time he was unable to name the park or give the location of the park. I asked him if he would show us where the weapon was, and he advised that he would." (Tr. 185)

The trial judge, outside of the hearing of the jury, held a hearing as required by Jackson v. Denno [See footnote 1] to determine (1) if said statements were actually made; (2) whether they were obtained as a result of interrogation after restraint and subsequent to the time the defendant had been adequately and properly advised of his Miranda rights, and (3) if defendant willingly and knowingly and intelligently waived those rights. After said hearing, the court held as follows:

"BY THE COURT: Alright, gentlemen, I don't require argument since this is a matter before the Court. I want to be sure the Court's ruling in this regard is recorded. With regard to the purported statement attributed to the defendant, 'I don't have the gun,' according to the State's evidence, this statement was made by the Defendant while he was under restraint and before being given the Miranda warning. Although it might come in under the spontaneous statement exception from that Miranda doctrine, the point is academic because I am unable to find as a preliminary matter of fact beyond a reasonable doubt that such a statement was made by the Defendant. Therefore, the Defendant's motion to suppress that statement will be sustained, and the witness presented by the State will be admonished that they [sic] are to make no reference to that statement in the presence of the jury without prior permission of the Court. The Court however finds beyond a reasonable doubt that the Defendant was, prior to making all subsequent statements in the automobile and while at the scene, advised of all of the Constitutional rights required by Miranda, including his right to remain silent, that any statement made by

him could and would be used against him, that he was entitled to be represented by an attorney at all times, that if he could not afford an attorney, that one would be afforded him at public expense, and that he had the right to terminate the interview or conversation at any time. The Court finds that the Defendant did thereafter knowingly and intelligently and willingly waive that right, and as a preliminary matter of fact finds that such statements were made; and that the same may be presented to the jury for their consideration and given such probative weight and value as they deem proper." (Tr. 278)

Defendant argues that since the trial court sustained the motion to suppress with respect to the statement "I don't have the gun," it should have suppressed the statements made after the Miranda rights were given and understood. With this contention, we cannot agree. The record clearly reflects that defendant was properly advised of his Miranda rights and that he understood them. The trial court properly found that the subsequent statements by defendant were voluntary and were made with the full knowledge and understanding of his rights.

In Lambert v. State, Okl.Cr., 471 P.2d 935, this Court held that incriminating admissions made by a defendant while in custody were admissible where there is evidence that defendant had been thoroughly advised of his rights prior thereto and that he understood those rights.

This Court will not disturb the trial court's ruling permitting the introduction of a confession when supported by sufficient evidence that the defendant knowingly and intelligently waived his rights and understood the consequences of said waiver. Warren v. State, Okl.Cr., 495 P.2d 837. In the instant case, the record reflects that the defendant so waived his rights. The finding of the trial court was, therefore, both correct and proper; and defendant's tenth proposition in error is without merit.

■ Defendant next contends that the trial court erred in overruling the defendant's motion to quash the arrest on the grounds that the only basis for the arrest was certain radio broadcasts which amounted to hearsay. In support of said argument the defendant cites Whitely v. Warden of Wyoming Penitentiary, 401 U. S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306. In the *Whiteley* case, the United States Supreme Court held that an officer did not have sufficient facts and information to support a finding of probable cause for an arrest without a warrant where (1) the officer had learned by police radio bulletin the description of the suspect and the car he was driving, and (2) the sheriff issuing the bulletin was acting on an informer's tip, but the record was devoid of any information at any stage of the proceeding from the time of the commission of the crime to the arrest which would support the reliability of the informer or his conclusion that the suspect was connected with the commission of same.

The *Whiteley* case is clearly distinguishable. In the instant case, one of the arresting officers arrived at the scene of the crime at approximately 11:45 p. m. and worked throughout the night trying to run down any information on the defendant or his possible whereabouts. Officer Sheldon had been an eyewitness to the shooting, and there were written statements of other witnesses. No informer was involved.

With reference to the police broadcasts, the United States Supreme Court held in Chambers v. Maroney, 399 U.S. 42, 90 S. Ct. 1975, 26 L.Ed.2d 419, that police officers, though having no warrant, had probable cause to arrest the occupant of a certain automobile where the robbery victim gave an accurate description of the suspect and the vehicle in which he escaped was accurately described by other witnesses. Also, in the *Whiteley* case, the Court held that it did not question that the police were entitled to act upon the strength of the police radio bulletin provided the instigating officer was acting on probable cause. There is no doubt in the mind of this Court that Officer Sheldon was acting on probable cause. See also Stephens v. State, Okl.Cr., 503 P.2d 1309, wherein this Court recently held that an arresting officer possessed sufficient information to establish reasonable cause when the officer received a radiogram report giving him a general description of the subjects involved in a robbery and a description of the vehicle and tag number. The description of the suspects involved and their vehicle was given to the police by eyewitnesses at the scene.

Therefore, we hold that there was a legal arrest based on probable cause in the instant case and that the defendant's contention is without merit.

Defendant, in his last proposition of error, urges that, taking the record as a whole, the evidence is not sufficient to support a conviction of murder. With this contention we cannot agree.

When there is a conflict in the evidence it is within the sole province of the jury to weigh and determine the issues of fact. Under these conditions the determination of the jury is binding upon this Court if the evidence reasonably tends to support the jury's finding. Darnell v. State, Okl. Cr., 369 P.2d 470.

A reading of the record in its entirety reflects that a duly empaneled jury was properly instructed by the trial court as to the applicable Oklahoma law, weighed the evidence as presented to it and returned a proper verdict based upon its deliberation as the finder of fact.

■ Defendant argues that defendant was convicted solely upon his uncorroborated confession to the police officers subsequent to his capture and arrest, citing Billey v. State, Okl.Cr., 381 P.2d 160, for the proposition that a confession must be corroborated by independent testimony or evidence before the jury can consider same for purposes of a conviction. In the instant case, Officer Ratikan was shot; defendant was at the scene and outside of the automobile when the shots were fired; defendant ran; there was conflicting testimony concerning defendant's possession of

a gun; and no gun was found in the possession of any of the other participants or witnesses or in the vicinity of the shooting. This certainly constitutes sufficient corroboration of defendant's confession.

For the reasons set out above, this Court finds that the evidence was sufficient to support a conviction of murder, the jury was properly instructed, and defendant's last proposition is, therefore, without merit.

From a consideration of the lengthy record as a whole, we do not find that defendant has been deprived of any substantial right, but that the issues were fairly presented to the jury, and defendant received a fair and impartial trial. The verdict and judgment appealed from are, accordingly, affirmed.

BUSSEY, J., concurs.

BRETT, J., concurs in results.