## Commonwealth v. Dukeman

*J. Harold Hughes*, Assistant District Attorney, for Commonwealth.

*Walter T. ReDavid*, for defendant.

REED, JR., J., July 21, 1971.—On April 14, 1968, Burman's antique and coin shop at 237 Baltimore Pike, Springfield, Delaware County, was burglarized. On April 30, 1970, defendant was arrested for this crime and charged with burglary, larceny and conspiracy. He was tried by jury commencing September 29, 1970, and convicted of burglary, only, on October 5, 1970. The dates are important. At the conclusion of Commonwealth's case, a demurrer to the conspiracy charge was sustained, by reason of the statute of limitations.

At the conclusion of the trial, defendant filed motions for new trial and in arrest of judgment. On November 10, 1970, defendant petitioned to interrogate jurors, which was denied without prejudice to argue the same as a further reason for new trial.

Burman's shop was broken into on April 14, 1968, by cutting a hole in the roof. Nothing, however, was taken because an alarm was tripped and the burglar fled; hence, the anticipated larceny failed.

The Commonwealth's case rested upon the testimony of Jerome John McKenney, an admitted and convicted felon, who admittedly faces trials on other charges. He portrayed himself as a former member of an extensive burglary ring, now engaged in redeeming his soul and cleansing his conscience by confess-

ing to all the crimes he had been involved in, naming his accomplices and associates in crime.

Jerome John McKenney testified that in the late evening of April 14, 1968, he, a Gilbert Seagraves and a Jacob Rosen drove to the shop. Rosen drove his car, dropping McKenney and Seagraves off at the side of the shop. These two then climbed onto the roof and chopped a hole in it. McKenney climbed through the hole into an office below, while Seagraves waited on the roof. McKenney crawled on his hands and knees to the location of the safes, where he unwittingly crossed the beam of an alarm which sounded on the outside of the building. He quickly retraced his path, got out of the hole, where he met his accomplices and they all fled.

McKenney explained that he and Seagraves had discussed this a few weeks previously with defendant Dukeman, who wanted them to do the "job," at a meeting in a restaurant in Lansdowne, Pa. Dukeman told them that the Burman shop had quite a few gold bars and guns in the safe and drew a diagram of the shop. In return for the information, Dukeman, as only a "tipster," was to receive between 10 percent and 15 percent of the "take." Dukeman then took them to see the location of the shop. They later went to Rosen's home where they discussed the "job" and even considered kidnapping Burman and his wife to use them for access to the shop and safes.

McKenney related that subsequent to the aborted incident, Dukeman was upset and disappointed that they didn't "score," and that he, Seagraves and Dukeman considered "importing" a gunman from New Jersey to do the job.

Defendant Dukeman, also an admitted and convicted felon, flatly denied any connection with

or involvement in the job, as well as any knowledge of Mr. Burman or his shop. He admitted knowing McKenney, but not prior to October 1968, after this incident.

Defendant raises six points in support of his motions for new trial and in arrest of judgment.

A. *Did the court commit error in refusing defendant's two motions for a mistrial?*

1. Defendant contends that the testimony of McKenney concerning discussions after April 13, 1968, of importing gunmen to perform the aborted "job," was beyond the scope and embrace of the conspiracy, and his motion for a mistrial at that time should have been granted. Such contention necessarily falls of its own weight. The conspiracy was not to cut a hole in the roof, go in, look around and get out. It was to get valuables therein. Until these were obtained, the conspiratorial agreement continued unless abandoned, which occurred when the efforts to get "imported" gunmen failed, and as McKenney said they "decided to leave it go, and go after something else."

The conspiracy continues until the object is completed, or so long as it is under consideration, and within those confines any related evidence is admissible: Cleaver v. United States, 238 F. 2d 766 (1956).

We agree that both defendant and Commonwealth cite the same controlling law. Defendant, however, fails to grasp the object of the conspiracy, and this contention has no merit.

2. The assistant district attorney during redirect examination of Commonwealth's witness McKenney, said:

"What is the occupation of Barker, legal or illegal?"

This had been prefaced by a reference to the fact

that McKenney on cross-examination had testified to being in defendant's company on some 30 occasions. McKenney said at different times, there were other men present. McKenney said that four of these men were: Thomas Barker, John Pettronie, Charles Fisher and Gilbert Seagraves. The Assistant district attorney then asked the question in issue.

Defense counsel promptly objected that the question was prejudicial and moved for a mistrial. The court denied this motion, and directed the jury to disregard it because it was an *improper question by the assistant district attorney.*

Defendant contends that this question excited or implanted a prejudice in the jury's mind against defendant. Defendant correctly cites the legal test to be applied, which is that the remark must be of such *unavoidable effect* as to prejudice the jury forming in their minds a fixed bias and hostility toward defendant: Commonwealth v. Flaherty, 167 Pa. Superior Ct. 19, 74 A. 2d 506 (1950); Commonwealth v. Meyers, 290 Pa. 573, 139 Atl. 374 (1927).

When we consider that McKenney mentioned no associates or friends who were not criminals, and that the defense consistently explored this realm in cross-examination, when we consider McKenney consistently placed defendant in and with criminal associates, it is difficult to imagine anyone mentioned who was not a criminal.

The assistant district attorney had a right to ask of Barker's occupation; that he did so by the ploy he used, while not a practice to be commended, cannot here be raised to the status of the prejudice required.

It would have been surprising if McKenney had answered the question and said that Barker's occupation was legal. The jury would indeed, in this case, have been impressed and skeptical. In the course of

this trial, McKenney mentioned no one except law enforcement officers and attorneys, who did not have criminal connections, and most he said knew defendant. Defendant also admitted knowing some of them. In the whole case, Barker's occupation had no significance. However, the question was unnecessary and utterly pointless, and we note that in instructing the jury to disregard it, the trial judge did give a type of reprimand to the assistant district attorney by saying it was an improper question, which was helpful to the defense.

B. *Was the verdict against the weight of the evidence?*

The Commonwealth proved a burglary had been committed. The only testimony implicating defendant was that of an admitted and convicted felon and co-conspirator. Such a witness is competent to testify: Commonwealth v. Viscosky, 83 Pa. Superior Ct. 96 (1924). His credibility then becomes the issue, which is a jury question, after proper instruction, and does not go to the weight of the evidence. The jury was instructed on reasonable doubt, credibility of witness generally, and also that the testimony of an accomplice must be treated with great caution, because its source may be tainted, impure or corrupt.

Defendant contends in addition, that since both defendant and Mr. Burman denied knowing or ever having seen each other, the Commonwealth's case must fail. This is not so. Defendant did not have to know, ever have seen, or have been seen by Burman, to have gained knowledge of his shop. He could get this information by various ways or means, and a jury could properly so infer.

There was sufficient evidence to make out defendant's guilt beyond a reasonable doubt, and, if

believed as it was, convict him. This contention must be denied.

C. *Did the court err in allowing certain testimony?*

Defendant recites five incidents during examination of witnesses by the assistant district attorney, wherein objection was made and overruled, allowing the assistant district attorney to introduce testimony, which defendant contends was prejudicial.

1. The assistant district attorney's question concerning Barker's occupation has been previously decided.

2. The assistant district attorney inquired of McKenney with reference to Gilbert Seagraves, a named coconspirator, being shot in Maryland later. This reference was proper in redirect examination as it had been made a subject by defense on cross-examination.

3 and 4. The assistant district attorney inquired of McKenney where he had met first, Barker, and second, Rosen; McKenney replied that he met Barker in New Jersey State Prison, and talked to Jacob Rosen, a coconspirator in this crime, in the New Jersey State Prison. These statements were proper subject of examination in that they involved McKenney's knowledge of a coconspirator (Rosen) in this case, and of Barker, an apparent friend or associate of defendant Dukeman.

For reasons previously noted, we cannot comprehend how defendant was prejudiced by these items of testimony.

5. A statement was made by Jack L. Burman in response to the assistant district attorney's question concerning the value of property in his shop on the day of the burglary. He said: "I would judge between

twenty and twenty-five thousand dollars, and that is a hypothetical guess."

He could not state any exact value. The court charged the jury that Mr. Burman's testimony could be considered only for the purpose of showing that there was an inventory. The establishment of an inventory within the shop was relevant in that it went to the motivation and object of the burglary; as such, it was admissible evidence.

6. Defendant complains that the assistant district attorney improperly commented upon a Commonwealth witness Burman's testimony in his closing argument. This occurred:

"Mr. ReDAVID: 'If the court please, may I once again, on the record—Mr. Hughes, in his argument has just stated that Mr. Burman was a *reluctant witness*.' (Italics supplied.)

"MR. HUGHES: 'That wasn't what I said. I said it may appear to you that Mr. Burman was a reluctant witness.' "

This statement alone cannot be classified as an improper statement. The use of the phrase "appear . . . a reluctant witness" falls far short of an attempted impeachment. There was no reference by the assistant district attorney to any portion of witness Burman's testimony which exhibited "reluctancy." It only went to describe his demeanor. After all, Mr. Burman was not at the scene; he was upset by what happened. He appeared to desire only to tell what he knew and that carefully. This could create an appearance of reluctance, but is not indicative of falsification. The assistant district attorney had a right to describe the apparent demeanor of witnesses.

D. *Did the court improperly exclude certain evidence?*

Defendant complains that a letter marked "D-6," offered by him, was improperly excluded.

Defendant placed in evidence 10 letters written by witness McKenney while he was an inmate at the Middlesex county jail in the latter part of 1969 and early 1970. Defense counsel cross-examined McKenney using these letters to show a motivation for McKenney's testimony to obtain concessions and favors from the police.

"D-6" was a letter addressed to a Mr. Thomas Hennessey, Stratford, N. J., dated February 24, 1970. The letter referred to Betty Smith and Miss Joan, apparently Joan Janiszewski, a former girl friend of McKenney and a defense witness. The letter contained no reference to defendant. The letter was not relevant to any motivation for testifying against defendant. Further, the letter indicated no "deal" between the authorities and McKenney. It was not relevant in this case.

E. *Should a new trial be granted because the court misstated a date in comment on defendant's evidence?*

During the charge and by way of summing defendant's evidence, the court stated:

"The theory of the defense is, and the defense offers testimony that the defendant, Edward Dukeman, did not know McKenney, he only met him for the first time some short time before April 14th, 1968, when on one Sunday morning he met Gil Seagraves, who was having breakfast with Dukeman at Horn and Hardart's Restaurant in Lansdowne . . ."

Defendant's testimony, however, was that he did not meet McKenney until October 1968, and that he didn't know him at the time of the burglary, April 14, 1968. The court meant to say "after" April 14, 1968.

The court nevertheless erred in its comment at this point. This contradiction, however, was not brought to the court's attention by defense counsel at any time, although a conference was held at the close of the charge and prior to sending the jury out.

However, the court had, in reviewing the evidence, stated:

"He [the defendant] said in October in 1968, he met McKenney for the first time in Horn and Hardart's in Lansdowne and that it was a Sunday and it was a pure chance meeting, not by arrangement. He didn't know McKenney in February, March or April of 1968. He said he never had any discussion with McKenney or Seagraves regarding Burman's."

The court instructed the jury as a preface to all the above:

"Members of the jury let me review the evidence briefly as I recollect it, reminding you again that it is your recollection of the testimony and the evidence which controls and not mine." And again at another point in the charge: ". . . let me remind you again, the facts are for your sole determination and not for the determination of counsel or of the Court. You and you alone must decide what the true facts are."

Defendant's failure to take exception to the court's charge, at the proper time, now precludes defendant from raising this point in motion for a new trial: Keener v. Hupert, 386 Pa. 412 (1956). The jury being adequately instructed that the facts were for its determination, there is no reason to assume that in assessing the facts, the jury failed to use its own recollection of the testimony.

F. *Should a new trial be granted upon an affidavit indicating that jurors may have seen the posted trial list, which showed defendant was to be tried for another, but unrelated crime?*

On November 10, 1970, counsel for defendant filed a petition to recall the jury, sequester them, and ask each member a series of questions, the upshot of which would be to ascertain if the jurors had seen, during the course of this trial, the daily trial list or term list of cases, which would have shown that defendant was to be tried for another offense at the conclusion of this case.

The petition was based upon an affidavit of defense counsel's associate indicating he (the associate) had by chance met and discussed the case with one of the lady jurors, on an occasion approximately two weeks after the conclusion of the trial. The affidavit related that this juror told him that she had seen a term-trial list booklet, which showed that defendant was listed for another trial, and also that other members of the panel read the posted daily trial lists, posted in the court house corridors, showing the same information. She also had related that she and other members of the jury had seen that a principal defense witness, one Joan Janiszewski, was also to be tried with defendant in that other case.

At request of defense counsel, the court held several conferences with defense counsel and the assistant district attorney to discuss and explore this matter. Afterward, the petition was denied, with leave granted to argue this issue as a point for new trial, at time of argument on defendant's original motion. This was done.

Defendant grounds this point upon the assertion that defendant was denied the presumption of innocence, citing Commonwealth v. McDaniel, 217 Pa. Superior Ct. 20, 268 A. 2d 237 (1970), in support of this contention. We cannot conclude that the McDaniel holding is controlling of this case for two reasons.

1. It has long been held in Pennsylvania that a jury cannot invalidate a verdict by its own testimony: Cluggage v. Swan, 4 Binney 150, 158 (1811); Commonwealth v. Greevy, 271 Pa. 95, 99, 114 Atl. 511, 512 (1921); Commonwealth v. Curry, 298 Pa. 363 (1930); Friedman v. Ralph Brothers, Inc., 314 Pa. 247, 249, 171 Atl. 900, 901 (1934); Redmond v. Pittsburgh Railways Company, 329 Pa. 302, 303, 304, 198 Atl. 71, 72 (1938); Commonwealth ex rel. Darcy v. Claudy, 367 Pa. 130, 79 A.2d 785, 130 F. Supp. 270, aff'd. 224 F. 2d 504, 351 U.S. 454, 100 L. Ed. 1331, 76 S. Ct. 965 (1951); Commonwealth v. Patrick, 416 Pa. 437 (1965).

Defendant proposes to do exactly what the law has not gone so far as to condone, to permit a jury to invalidate its own verdict by the process of eliciting testimony from them as to their conduct and deliberation, in considering information not in evidence and which *might* have influenced this verdict, and this after they have been dismissed and dispersed.

Since a jury cannot be reassembled and interrogated after trial, neither can unsworn, ex parte statements of a juror be given weight on application for new trial: Commonwealth v. Patrick, supra, page 443. Any other decision would result in complete pandemonium, destructive of the whole system of trial by jury. A verdict would be reduced to the status of an interlocutory decree subject to review later of any possible outside factors, or information that may be uncovered that might have affected a jury in arriving at verdict. This we do not believe is within the scope and intent of the *McDaniel* case, where the influencing factor was exposed before the jury was dismissed and dispersed.

2. Assuming that the jury did see the lists and that they all knew defendant was also to be tried on other

charges, in this case, the whole thrust of the defense was that McKenney (Commonwealth's chief witness) was unworthy of belief, and was engaged in the tactic of indiscriminately bringing charges against many with whom he had come into contact, to involve them in crimes of which he was charged, to gain favor or consideration for himself.

For example, defense counsel asked McKenney on cross-examination:

"Q. . . . What do you mean when you say that would give me the help that I need."

"A. The help that I need—I need . . . *there are quite a few people involved in all these things.* While each and every one of them could come forward and testify just as I am. Naturally, if there were two or three different people or more, it would lend more credence to my testimony. *I was looking for a little help. Yes, sir,* and *Mr. Dukeman is quite able to give it.*" (Italics supplied.)

And, again, by defense counsel:

"Q. All right, can you recall . . .You recalled other names, can you recall other general locations where you may have been present when Miss Joan . . .

"A. *I am not allowed to talk about other crimes, can I?*

"Q. I don't think you have stopped since you started testifying. You haven't heard me objecting. *If you want to go ahead, Mr. McKenney* let's hear what you have to say.

"A. Well, Miss Janiszewski was with *Mr. Dukeman* and myself, Mr. Seagraves, Mr. Louis Falls in Delaware when we pulled an armed robbery down there. Miss Jan . . . was with Mr. Dukeman, Mr. Seagraves, Mr. Barker, Mr. Pettronie and this colored fellow

'Slim' *and myself when we pulled an armed robbery in Nether Providence,"* [Delaware County, Pa.]

The Nether Providence incident was the one for which defendant was listed to be tried.

And further:

"Q. Let me ask you this, Mr. McKenney, I don't quite know how to put it, but are there *any people that might be termed legitimate people* or people *that don't have any connections or arrests* or anything that you could name that saw you and Joan together *in the company of Mr. Dukeman?*

"A. *No the only time we were together, it was usually hooked up with criminal activities and honest people aren't usually around then."* (Italics supplied.)

Then, during direct examination by defense counsel of Stephen Balogh, a convicted murderer, and a defense witness, the following:

"Q. And did he say he was going to do this?

"A. Yes, he was going to bury her with charges that she never did . . ."

And further:

"Q. And what was the conversation regarding Mr. Dukeman?

"A. Well, actually he was talking about a man named Hans and Dukeman I believe at the same time, you know, he was talking about them both and *he had said he was going to put Dukeman in prison* on crimes even though he didn't do them." (Italics supplied.)

It was plainly evident that defense counsel through questioning on cross-examination and direct examination made every effort to bring to the jury's awareness that McKenney was involving defendant Dukeman and witness Janiszewski in other crimes for his own gain, attempting to discredit his testimony. It would come then as no surprise that defendant was

to be tried for other crimes. This would verify exactly what defendant wanted them to believe.

For this reason, we cannot be persuaded that defendant was at all prejudiced even if the jurors had the trial in their hands.

The whole case came down to a barrage of criminal charges and counter charges. The jury, nevertheless, did pick its way through and found as they had to, that McKenney was guilty, and a criminal by admission, and that he and defendant were coconspirators and accomplices of long standing in criminal activity, and that defendant was guilty also.

## ORDER

And now, July 21, 1971, defendant's motions for new trial and in arrest of judgment are denied, and defendant is directed to appear before the court for sentencing on Wednesday, July 28, 1971, at 10 a.m., court room No. 6, Court House, Media, Delaware County, Pa.