Appellant was indicted and convicted under § 13A-5-31 (a)(2) Code of Alabama 1975, for robbery or attempts thereof when the victim is intentionally killed by the defendant. After a separate hearing on aggravating and mitigating circumstances, the jury fixed his punishment at death. Subsequently, the trial court weighed the aggravating and mitigating circumstances pursuant to § 13A-5-33, Code of Alabama 1975, and sentenced appellant to death. The court issued both oral and written findings of fact from the trial and the sentence hearings which set forth the aggravating circumstances the court found sufficient to support the sentence of death.[1]
The facts of this case are detailed in the companion case ofRaines v. State, 429 So.2d 1104 (Ala.Cr.App.), aff'd, Ex ParteRaines, 429 So.2d 1111 (Ala. 1982). However, because of the nature of the offense and the gravity of the punishment involved in this case, we will set forth the crucial facts as presented at trial below.
Mrs. Jean Mayfield testified that her husband, Mr. Milton Mayfield, was employed at Eugster Meat Market in the Powderly area of Birmingham, Jefferson County, Alabama, on November 26, 1980. Mr. Mayfield, the victim of this crime, was seventy-nine years of age. Mrs. Mayfield recalled that their son drove Mr. Mayfield to work at 7:15 a.m. that day. Mrs. Mayfield next saw her husband sometime after 11:00 a.m. in the intensive care unit of University Hospital in Birmingham. She testified that around 5:30 p.m., after tests revealed there was no brain activity, Mr. Mayfield was disconnected from life supporting systems which had been attached to him. Mr. Mayfield was pronounced dead shortly thereafter.
W.L. Allen, Chief Deputy Coroner for Jefferson County, testified that the autopsy on Mr. Mayfield revealed that his death was caused by a gunshot wound to the head. The bullet entered around the bridge of the nose, passed through the brain, and came to rest in the subcutaneous tissue of the right side of the scalp.
Mrs. Mary Owens testified that she and her husband, L.E. Owens, owned and operated Eugster Meat Market, where Mr. Mayfield worked. On November 26, 1980, sometime after 10:00 a.m., appellant and another man entered the store and walked down the side of the meat counter. Appellant jumped up onto the counter, pushing Mrs. Owens, who was behind the counter, and said "Move it, move it." Appellant held a gun in one hand and a yellow bag in the other hand which he shook at Mr. Owens, who was inside the checkout area. Mr. Mayfield, who was standing about twenty feet away, was slicing bacon and could not hear over the noise from the machine. Mr. Mayfield turned his head slightly toward appellant, and appellant immediately shot him.
Appellant turned the gun on Mrs. Owens and Mr. Owens told her to "get down." After lying down on the floor, Mrs. Owens heard appellant tell Mr. Owens to open the cash drawer and give him all of its contents. Mr. Owens cooperated, and asked *Page 1058 
appellant not to shoot any more. Appellant's accomplice then said "Let's get out of here," and as they started to flee, appellant told his accomplice "I shot one." Mrs. Owens then ran back to Mr. Mayfield, where she saw he had been shot in the head.
Mrs. Owens positively identified appellant in court as the man who robbed the market and shot Mr. Mayfield.
Mrs. Sherrie Morgan testified she was a customer in Eugster Meat Market at the time of the robbery. Mrs. Morgan corroborated Mrs. Owens's testimony, although she stated she heard, but did not see, the gun fired by appellant. Mrs. Morgan also identified appellant in court as the man she saw jump up onto the counter during the robbery at Eugster. She, too, heard appellant say "I shot one" as he and his accomplice left the market.
Mr. L.E. Owens testified his business, Eugster Meat Market, was robbed by two men on November 26, 1980. Again, Mr. Owens corroborated Mrs. Owens's testimony and identified appellant in court as the man who jumped onto the counter. He stated appellant shot Mr. Mayfield before he could give him the money. Approximately twenty-four hundred dollars was taken from the cash register during the robbery.
Mr. William Sanders testified he was the security guard at Eugster's on November 26, 1980. He recalled that two men came into the store around 11:00 a.m. One stopped at the cashier's cage, and the second man walked to the back of the store where Mr. Sanders stood. Suddenly, Mr. Sanders was struck in the side with a gun and knocked to the ground by the second man. The assailant took his gun and told Mr. Sanders, "If you get up I am going to kill you."
While the second man held him at gunpoint, Mr. Sanders heard a shot fired at the front of the market. He also heard the first man say "I just shot one," as they started to leave.
Mr. Sanders was subsequently able to identify the man who held the gun on him as Chestine Raines.[2] He could not identify appellant as the man at the front of the store, however.
Sergeant Albert Wallace testified he was the chief detective assigned to investigate Mr. Milton Mayfield's murder for the Birmingham Police Department. His testimony recounted details of the investigation as it involved interviewing witnesses and establishing identification for the suspects by photographic arrays and lineups.
After the state rested its case at the close of the guilt phase of the trial, appellant rested his case without presenting any evidence.
At the sentencing phase of appellant's trial, the state produced evidence that appellant had previously been convicted of a felony involving the use or threat of violence to the person, that being a 1976 conviction for robbery when appellant was sixteen years old.
The appellant took the stand in his own behalf and stated that he was twenty-two years old. He admitted the prior conviction of robbery and testified he served three years and eight months in the penitentiary for that offense. Appellant denied any involvement in the death of Mr. Mayfield. He did know and associate with Chestine (Chastine) Raines during November of 1980, but did not see Raines on November 26, 1980.
Despite appellant's earnest argument to the contrary, we again recognize the holdings of this court and the Alabama Supreme Court that the death penalty provisions under which appellant was convicted are constitutional. Ex Parte Raines, supra; Beck v. State, 396 So.2d 645 (Ala. 1980); Potts v.State, 426 So.2d 886 (Ala.Cr.App. 1982), aff'd, Potts v. State,426 So.2d 896 (Ala. 1983).
Reviewing the facts of this case in light of the facts and holdings of Raines, *Page 1059 
supra, we also again find that Mr. Mayfield was a "victim" of the robbery at Eugster Meat Market as that term is defined in § 13A-5-31(a)(2), Code of Alabama 1975. Ex Parte Raines, supra. Any contention that Mr. Mayfield was a mere bystander, as opposed to a victim of the robbery, is refuted by applying the reasoning of Woods v. State, 55 Ala. App. 450, 316 So.2d 698
(1975), which was quoted by this court in Raines, supra.
Appellant raises only one issue which has not been answered by the holdings of the companion case of Raines, supra. Appellant contends he was denied due process of law by the state's failure to disclose exculpatory information for which there had been a general request by motion of appellant. Our review of the record indicates, however, that the issue may more appropriately be framed as involving the timing of the disclosure, the materiality of the report and the responsibility of appellant's counsel to take the opportunity to effectively use the disclosed information, rather than the state's failure to disclose the information prior to trial.
Appellant was appointed counsel and arraigned on July 8, 1981. At that time, the case was set for trial on October 26, 1981 and passed to April 12, 1982. Appellant filed a lengthy motion to compel production or disclosure on or about August 3, 1981. Although a hearing on the motion was set for August 20, 1981, for some reason not apparent from the record, the only hearing reflected in the transcript was held on April 12, 1982, immediately prior to trial. However, the record reflects no attempt or motion by appellant to have the motion set down for hearing at any earlier date.
At the pretrial hearing on the motion, the trial court inquired as to whether the prosecutor was aware of any exculpatory information which had not been made known to appellant. The record reflects the following exchange:
 "MR. GOMANY: No, sir, Judge. Of course, I forgot much of the transcript details, but I imagine that would be about it. Except one thing, just looking through here, I just came across — I read something in a supplementary report that Birmingham police officers filled out on this time it happened. You might want to take a look at it, it might be considered exculpatory.
 "THE COURT: Mr. Wilkinson, have you seen the incident report, I guess you would call these documents, from the Birmingham Police Department as relates to this case?
 "MR. WILKINSON: No, sir. And we would request them.
 "THE COURT: Mr. Gomany, I am going to grant Mr. Wilkinson's request as it relates to this particular document and allow him to observe and see this. Mark this Defendant's Exhibit I for identification, since it is your motion." (R. 4-5)
At appellant's request, the trial court reserved any final ruling on appellant's motion for production until after appellant had the opportunity to review the report. The following discussion was then held:
 "MR. WILKINSON: Judge, in view of what one says — on the motion, says about the possibility of there being a witness who overheard two other persons confess to this particular crime that the defendant is accused of, I think we need to make further inquiries as to whether or not this witness is still available.
 "MR. GOMANY: That may have been brought out in the other transcript.
 "MR. WILKINSON: It may have, but we would like to request as to whether or not that witness is available and ask for an instanter subpoena. Of course, if that witness is available —
 "MR. GOMANY: Wallace can probably enlighten us on who these people are.
 "MR. WILKINSON: Well, we will trust the Court's discretion as far as proceeding ahead at this point. I understand, presumably we have two other persons who are overheard confessing to this particular crime by yet a third person, who would obviously be a material witness.
 "THE COURT: Go ahead with the jury identification and voir dire and I will certainly give you an opportunity to issue a subpoena if you feel it is necessary. *Page 1060 
And we will resolve the matter before we impanel the jury."[3] (R. 5-6)
Following an extended voir dire of the prospective jurors, the jury was struck and sworn without objection. No further request was made by appellant for a ruling on his motion concerning exculpatory information, nor did appellant request a continuance in order to locate the witnesses mentioned in the police report.
The next reference by appellant to this information occurred on the afternoon of the second day of trial, during the testimony of Sergeant Albert Wallace, the chief detective assigned to investigate Mr. Mayfield's death. Sergeant Wallace, when shown a copy of the police report, denied that it was a part of his investigative file. He stated he had never acted upon the information contained in the report, which had been taken by Officer John Barella and Officer Jeff Sartain. The state objected to further testimony concerning the content of the report. Out of the presence of the jury, the following arguments were presented:
 "MR. WILKINSON: May it please the court. It was our position, really, and this was our way to get into it, I guess, without getting into — it is our position that this being a capital felony, we filed a motion for discovery of any exculpatory, or possibly exculpatory material. That was complied with Monday, the day the trial began. And as you know, that incident report contained an allegation that a witness was talked to by the City of Birmingham Police Department who said that two persons other than the defendant allegedly committed the crime, and those persons lived on Lawn Avenue. As the Court is also aware, we attempted, albeit we did not get the information until Monday, by instanter subpoena, to get the witness who allegedly overheard the remarks, and the instanter subpoena was unsuccessful.
 "It is our position that we have not, under the circumstances, had in this type of case, a reasonable opportunity to secure the presence of those witnesses — or that witness, or those witnesses. In lieu of that, we would like to be allowed or permitted to either question Mr. Wallace about the incident report or offer it into evidence. And if that is denied, we would respectfully request a mistrial — an opportunity to subpoena the three witnesses.
 "THE COURT: Do you want to be heard on that, Mr. Nail, Mr. Gomany?
 "MR. NAIL: Judge, we would object to the admission of that document or the information recorded on that document on the basis it is hearsay. There is no way we can cross-examine that document. And we would object to its admission on that basis.
. . . .
 "MR. WILKINSON: Monday was the first knowledge anybody on the defense side had of the existence of those three people and that document. And I think we made every legal effort that we had at our disposal to get those people here. Now, if we cannot have them, and I understand the practicality — if we cannot have them, then I think we are entitled to have the information as such for whatever weight it may have in evidence.
"MR. GOMANY: Well, Judge, anybody —
"THE COURT: Well, I —
 "MR. GOMANY: — could confess to a crime and say someone else did it.
 "THE COURT: I sustain the objection. I will give Mr. Wilkinson an opportunity to state his grounds for the record. I will still sustain the objection. Do you want to make a motion for a mistrial at this time, Mr. Wilkinson?
 "MR. WILKINSON: Yes, sir. We do want to make a motion for a mistrial. And the ground is this: That, of course, the exculpatory material contained in that report, which we would ask the Court to make a part of the record —
"THE COURT: It is a part of the record. *Page 1061 
 "MR. WILKINSON: — relates to a confession to this particular crime, not by just any two individuals, but by two individuals who lived on Lawn Avenue. And it has been testified to in this trial, that particular avenue has been alluded to at least two or three times in the testimony. Which I think gives added significance to the names contained in the report.
 "I think gives added importance to us being allowed to have those — well, really, ultimately, those two individuals who are named in there, the individuals — the three individuals. The one who heard the admission and the two who made them.
 "THE COURT: Overrule your motion for a mistrial. As I understand, there has been no request made for anyone other than one Johnny Jackson, by subpoena.
 "MR. WILKINSON: Originally that was correct, by instanter subpoena. If the Court feels it is necessary, then we would request an instanter subpoena for those other two individuals.
. . . .
"THE COURT: Oh. Now, you are making that request?
"MR. WILKINSON: Yes, sir. Yes, sir.
 "THE COURT: All right. We will do that." (R. 287-290)
At the conclusion of these arguments, Sergeant Wallace stated that the first time he had seen the report was "yesterday afternoon."
Later in the afternoon on this same trial day, the following occurred during the voir dire examination of Sergeant William Gautt:
 "MR. WILKINSON: Also, before we bring the jury back, we might as well finish it up. The instanter subpoena for the two witnesses, as I understand it, have been returned insufficient address. So, in view of the fact that we consider those two witnesses, plus the reporting witness, to be critical material witnesses, and we really do not believe that we have had sufficient opportunity to get them. And we think they are material on the question of guilt or innocence of the defendant, and therefore, we would respectfully request a mistrial based on the inability to get them.
 "THE COURT: I reserve ruling on that until in the morning, to give you other opportunity over the evening to make efforts to locate them. And I will reserve ruling until that time. You can make your motion again at that time.
 "MR. WILKINSON: Yes, sir. I would like to explain the reason that we asked initially the Court to issue an instanter subpoena, merely for the reporting witness, that this information is in the nature of an admission by two people that they committed a crime, but we anticipate perhaps they might deny it and be impeached. And that is why we asked for him first.
 "THE COURT: All right. I understand. Now, as I understand, gentlemen, this will be the last question asked by the State and the State will rest after this witness?
"MR. GOMANY: Yes." (R. 307-308)
The state rested its case at the close of Sergeant Gautt's testimony. Appellant moved to exclude the state's evidence and requested a mistrial on grounds unrelated to the exculpatory police report. After the court denied his request, this exchange occurred:
 "MR. WILKINSON: I would presume we would be ready to argue in the morning unless some witness turns up that we are in the process of trying to find.
 "THE COURT: I understand. We will be in recess, gentlemen, until nine o'clock in the morning." (R. 313-314)
The following morning, appellant rested his case without again raising the issue of the exculpatory witnesses. The issue was not raised again by appellant until in brief on appeal.
As the recitation above makes clear, this is not a case wherein potentially exculpatory material was suppressed, either purposefully or negligently, until during or after trial as occurred in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194,10 L.Ed.2d 215 (1963). The prosecutor immediately made *Page 1062 
the information available to appellant, prior to trial, upon discovering the existence of the report. As well, his discovery of the report coincided with the hearing on appellant's motion for production, and the report was tendered to appellant in immediate compliance with the judge's order to produce the same.
Likewise, even if we were to assume that the prosecutor had a duty under United States v. Agurs, 427 U.S. 97,96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), to reveal the potentially exculpatory report because it constituted evidence highly probative and clearly supportive of innocence, the significance of which he may be presumed to have recognized even if he overlooked it, the report was in fact provided to appellant prior to trial. The information was in appellant's possession at that point for him to act upon as he believed necessary.
Because the information was given to appellant prior to trial, it was apparent to him at that point that there existed information which might warrant further investigation. If he deemed it necessary, a continuance should have been requested by appellant before the jury was selected, upon receiving information which might necessitate a continuance. Hoppins v.State, 337 So.2d 134 (Ala.Cr.App. 1976). Not only did appellant not request a continuance at that point, our review indicates that appellant never requested and was never refused a continuance of the trial in order to allow him to pursue this information.
Appellant's requests for instanter subpoenas were granted by the judge. Further, the judge postponed entering a decision on appellant's final motion for mistrial, based upon the failure of the subpoenas to produce the witnesses, until the following morning to allow appellant more time to find the witnesses. Appellant then rested his case the following day without again pursuing his motion for mistrial, or requesting a continuance. Therefore, there was no refusal by the trial court to act upon appellant's request for a mistrial. Appellant did not move for a continuance. Appellant did not pursue his motion for mistrial, as instructed by the judge. We fail to see wherein he asserts error or abuse of discretion in any action by the trial court in this regard. See United States v. Long, 674 F.2d 848
(11th Cir. 1982).
For aught that appears from the record, appellant's counsel may well have talked with both Officers Barella and Sartain, as well as the potential witnesses, following the close of the second day of trial and satisfied himself that their testimony would be of no avail. We note also that no motion for new trial alleging newly discovered evidence discovered as a result of the witnesses revealed by the police report has been filed subsequent to trial. Appellant does not allege in brief that any new exculpatory evidence has been discovered from pursuing that information.
Additionally, the testimony of the witness who allegedly overheard the other two confessions would not have been admissible at trial, even had that witness been found. Such testimony would have been hearsay, and therefore irrelevant and incompetent to prove appellant's innocence. Law v. State,407 So.2d 572 (Ala.Crim.App. 1981). See note 3 supra. The only potential value to appellant of this witness's statement was to enable him to investigate the men who were alleged to have been overheard saying that they committed the crime.
We cannot say that appellant did not have every opportunity requested by him to locate any potentially material witnesses revealed by the prosecution's pretrial disclosure of the police report.
Viewing the uncontradicted eye-witness testimony and positive identifications made of appellant, in the context of the entire record, we do not believe there could have been any reasonable doubt about appellant's guilt, whether or not the additional information has been pursued. Considering the vagueness and hearsay nature of the information contained in the police report against the certainty and uniformity of the testimony of the eye-witnesses to the crime, we do not find that the evidence would have created a reasonable doubt that did not otherwise exist, had appellant *Page 1063 
sought and been refused a continuance. Agurs, supra; Ex ParteRaines, supra.
Appellant failed to take action to be allowed further time to search for the witnesses. There is no indication to show that further time, if granted, would have produced the witnesses. There is no reason to believe that if the witness or witnesses were found that they would be available and willing to testify or that they would not be impeached in their testimony. As we stated previously, the hearsay testimony of the witness originally subpoenaed by appellant would not be admissible even if he was found and was willing to testify. See United Statesv. Smith, 591 F.2d 1105 (5th Cir. 1979).
Because the allegedly exculpatory information was not suppressed under the scope of Brady and Agurs, supra, the information was not material in the context of the record as a whole, and because appellant's opportunity to use and develop the information was not thwarted by the court, we find no merit to appellant's contention as regards suppression of evidence. As stated by the United States Supreme Court, and quoted by this court in Raines, supra, at 1108:
 "While this Court stands ready to correct violations of constitutional rights, it also holds that it is not asking too much that the burden of showing essential unfairness be sustained by him who claims such injustice and seeks to have the result set aside, and that it be sustained not as a matter of speculation but as a demonstrable reality. United States ex rel. Darcy v. Handy, 351 U.S. 454, 462, [76 S.Ct. 965, 970, 100 L.Ed. 1331] (1956). This burden has not been met."
The standards and procedures outlined by the Supreme Court of Alabama in Beck, supra, for the review of capital cases by this court have been diligently followed in our scrutiny of this transcript. We find that the crime was properly punishable by death, and that the sentence was appropriate in its relation both to the crime and to the individual appellant. The accomplice to this crime has likewise been tried, convicted, and sentenced to death. Raines, supra. No error prejudicial to the substantial rights of appellant having been found, this case is affirmed.
AFFIRMED.
All the Judges concur.
[1] The trial court's written findings of fact are appended to this opinion.
[2] The record spells Raines's first name as Chestine, rather than Chastine, as it appears in the companion case cited supra.
[3] The entire thrust of appellant's argument here is directed toward a third party's hearsay statement, discussed infra.
 APPENDIX A STATE OF ALABAMA, Plaintiff, VS DARRYL TRAVIS WATKINS, Defendant. No. CC81-937 IN THE CIRCUIT COURT OF THE TENTH JUDICIAL CIRCUIT OF ALABAMA IN AND FOR JEFFERSON COUNTY FINDINGS OF FACT
I find as fact that on November 26, 1980, Darryl Travis Watkins and Chastine Lee Raines entered Eugster's Meat Market at 2833 Park Lawn Ave. S.W., Birmingham, Alabama. At that time they were armed with pistols and entered the store with the express purpose of committing the crime of robbery.
I find as fact that upon entering the store Chastine Lee Raines attacked, disarmed and threatened to kill the security guard on duty on the store. While Raines was doing this, Darryl Travis Watkins jumped upon the counter of the store, stated their purpose and ordered everyone to get down on the floor. Milton Mayfield, who was at the time 79 years old, either did not hear or was too slow in obeying this command and was intentionally shot and killed by Darryl Travis Watkins. Watkins and Raines, after completing the robbery, left the store.
Approximately one month later, Darryl Travis Watkins, was apprehended, identified and charged with this offense of which he now stands convicted.
I find that at the time of the offense the defendant was 21 years old. *Page 1064 
 APPENDIX A — Continued AGGRAVATING CIRCUMSTANCES
§ 13A-5-35 (2) I find as an aggravating circumstance that the defendant was previously convicted of robbery, a felony involving the use or threat of violence to the person.
§ 13A-5-35 (3) While this aggravating circumstance is likely present I specifically make no such finding.
§ 13A-5-35 (4) I find as an aggravating circumstance that the capital felony was committed while the defendant was engaged in the commission of a robbery.
 MITIGATING CIRCUMSTANCES
§ 13A-5-36 (1) I find that the defendant does have a significant history of criminal activity.
§ 13A-5-36 (2) I find no evidence that the capital felony was committed while the defendant was under extreme or emotional disturbance.
§ 13A-5-36 (3) Not applicable.
§ 13A-5-36 (4) I find that the defendant was a principal in the commission of this capital felony and his participation was substantial.
§ 13A-5-36 (5) and (6) I find no evidence that the defendant acted under extreme duress, under the substantial domination of another person or that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.
§ 13A-5-36 (7) The age of the defendant is considered a mitigating circumstance as he was at the time of the commission of the capital felony 21 years old.
I have also considered carefully the presentence report and all of the testimony presented at the Guilt and Sentencing phase of this defendant's trial and find no unenumerated mitigating circumstances.
After consideration of the aggravating circumstances and mitigating circumstance, I find that the aggravating circumstances outweigh the mitigating circumstance and the verdict of the jury is due to be and is upheld.
I, therefore, sentence the defendant, Darryl Travis Watkins to suffer death by electrocution on the 10th day of September, 1982, and the Sheriff of Jefferson County, Alabama is directed to deliver the defendant to the custody of the Director of the Department of Corrections and Institutions at Montgomery, Alabama, and the designated executioner shall, at the proper place for the execution of one sentenced to suffer death by electrocution, cause a current of electricity of sufficient intensity to cause death, and the application and continuance of such current to pass through the body of said Darryl Travis Watkins until he is dead.
Dated this the 11th day of June, 1982.
 /s/ Dan Reynolds -------------------- Dan Reynolds Circuit Court Judge